In re WATSON.

(District Court, E. D. Kentucky. October 11, 1912.)

1. BANKRUPTCY (§ 163*)—VOIDABLE PREFERENCE—RECORDABLE TRANSFERS.

The only effect of the amendments of Bankr. Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1911, p. 1506), by the addition of the provision that, "where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required," was to carry forward the four months' period within which a recordable transfer which was in fact preferential might be attacked as voidable under subdivision "b," leaving the question whether or not the transfer constituted a voidable preference to be determined as of the date when it was actually made; and a transfer which was then made for a present consideration, and was not therefore preferential, does not become so because of delay in recording.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 163.*]

2. BANKRUPTCY (§ 163*)—VOIDABLE PREFERENCE—RECORDABLE TRANSFERS.

Nor did the amendment of Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), by Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506), change the effect of the act in that respect, it being essential to a preferential transfer, both before and after amendment, that it should have been to or for the benefit of a pre-existing creditor, who thereby gained an advantage over other creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 163.*]

3. MORTGAGES (§ 175*)—EFFECT OF DELAY IN RECORDING—KENTUCKY STATUTE—"CREDITORS."

Ky. St. 1903, § 496, providing that "no * * * mortgage * * * shall be valid against a purchaser for a valuable consideration without notice thereof, or against creditors until * * * lodged for record," in view of the construction placed thereon by the Court of Appeals of the state, by the word "creditors" includes only subsequent creditors without notice, who by their own activity have acquired a hold or lien on the property covered by the mortgage before it is lodged for record.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 417, 418; Dec. Dig. § 175.*

For other definitions, see Words and Phrases, vol. 2, pp. 1713–1727; vol. 8, pp. 7622–7623.]

4. BANKRUPTCY (§ 175*)—MORTGAGE—SUFFICIENCY OF PROOF.

Evidence considered, and held not to sustain the objections of a trustee to a mortgage executed by the bankrupt to his mother on real estate for a portion of the purchase price thereof, on the ground that it was not executed at the time it bore date, and that the mortgage and notes secured were for a larger amount than was due claimant.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 175.*]

5. BANKRUPTCY (§ 184*)—MORTGAGE—VALIDITY OF LIEN.

The withholding from record of a mortgage given by a bankrupt to his mother for the purchase price of the mortgaged property, where it was not by agreement with or at the instance of the bankrupt, but on

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the advice of third persons to avoid what was deemed double taxation, *held* not to invalidate the mortgage as against the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. § 184.*]

6. MORTGAGES (§ 175*)—IMPEACHMENT FOR FRAUD—FAILURE TO RECORD.

The mere withholding from record of a mortgage does not invalidate it for fraud, unless it was pursuant to a fraudulent purpose to give the mortgagor a fictitious credit.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 417, 418; Dec. Dig. § 175.*]

In the matter of Luther B. Watson, bankrupt. On review of order of referee allowing claim of Alice P. Watson as a secured claim. Order confirmed.

F. W. Schmitz, of Covington, Ky., for petitioner.

U. J. Howard, of Covington, Ky., for respondent.

COCHRAN, District Judge. This cause is before me on motion to reconsider an order, heretofore entered, on a petition for review, approving an order of the referee. The petition was filed and the motion is made by the trustee. The order complained of was the allowance of the mortgage of Alice P. Watson, the bankrupt's mother, as a preferred claim against a parcel of ground on the southwest corner of Latonia and Sanford avenues in the city of Covington, Ky., with a dwelling house, saloon, clubhouse, bowling alleys, and other improvements located thereon, near the Latonia race track, subject to a prior mortgage in favor of the Covington Savings Bank & Trust Company for $6,000. The mortgage originated in this way. The real estate was acquired by the bankrupt from his mother. Prior to February 16, 1909, she had sold and, on that date, she duly conveyed it to him. The deed recites the consideration to be "$1.00 and other consideration paid and to be paid." She claims that the purchase price of the property was $10,800, of which $4,000, part of a loan of $4,500 made by the Farmers' & Traders' National Bank to the bankrupt with William Reidlin as surety, who was indemnified by a first mortgage on the property, was paid to her in cash, and for the remainder of which, to wit, $6,800, the bankrupt gave his five notes, one for the sum of $700 payable in one year, and four for the sum of $1,525 each, payable, respectively, in two, three, four, and five years, each note bearing 5 per cent. interest, and, further, that on that date the bankrupt and his wife executed a mortgage to her on the property, subject to that in favor of Reidlin, to secure the payment of this unpaid purchase money. This mortgage was not recorded until August 16, 1910. In the meantime, to wit, on April ——, 1910, the bankrupt obtained a loan from the Covington Savings Bank & Trust Company for the sum of $6,000, out of which the loan for which Reidlin was surety was paid and secured same by a mortgage on the property which was at once recorded. It is this mortgage to claimant which the referee allowed as a preferred claim, subject to the $6,000 mortgage, and of whose allowance complaint is

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

here made. On August 13, 1910, the bankrupt, having become hopelessly insolvent, fled the state to avoid his creditors, and on August 26, 1910, this proceeding was instituted.

The mortgage is attacked on several grounds. It is questioned whether the bankrupt really owes the claimant the amount of money thereby secured, and also whether he and his wife executed it at the time claimed. It is, however, very doubtful whether it is seriously urged that either of these things is so. It is urged seriously that the mortgage was fraudulently withheld from record, and is therefore void. Besides these, there are two grounds of attack not involving the meritoriousness of the debt or mortgage. I will dispose of them first. In dealing with them I assume that the purchase price of the property on the sale from the claimant to the bankrupt was $10,800, of which $4,000 was paid in cash and for the remainder of which, to wit, $6,800, notes were given as hereinbefore stated, no part of which has ever been paid; that the mortgage to secure those notes was executed simultaneously with the conveyance of the property; and that the mortgage was not fraudulently withheld from record. Whether what is assumed is true will be considered after these two grounds of attack have been disposed of. The question, whether it is, has no pertinency to either of them.

One is, that the mortgage is a voidable preference. Is this so? We have seen that it was made February 16, 1909, and recorded August 16, 1910, 18 months afterwards. It was made, therefore, before the enactment, June 25, 1910, of the amendment to section 60b, relating to voidable preferences, and recorded subsequent thereto. This presents a question whether that amendment is applicable to this case. The trustee contends that it. is, and that under it the mortgage is a voidable preference. He would, if necessary, contend that it is such under the act as it stood before the amendment, but, however this may be, he is quite sure that it is a voidable preference under that amendment, and that it applies. Of the two questions involved—i. e., as to whether under that amendment, if it applies, the mortgage is a voidable preference, and, as to whether it applies, the former is the more important, and, as I think that the mortgage is not a voidable preference under that amendment, I will limit the discussion thereto, and pass the other by.

[1] It will be helpful in determining whether the mortgage is a voidable preference under the amendment of 1910 to section 60b to approach it from a consideration of how the matter would stand under that section as it was before the amendment. I am clear, though the trustee would not have it so, that thereunder the mortgage cannot be a voidable preference. This is so, because it was not made to secure a then existing indebtedness, but one created simultaneously with its making. In other words, the consideration therefor was a present, and not a past, one. Certain federal courts have held that, though a recordable transfer was made to secure a present debt, yet if it was not then recorded, but is subsequent thereto, and at that time the maker is insolvent, and the other essentials of a voidable preference exist, it is a voidable preference, because under the amend-

ments of 1903 it should be judged as if it had then been made. I criticised this view and the cases which had taken it in the case of Debus v. Yates (D. C.) 193 Fed. 427. I held therein that the sole effect of the prolonging words as to recordable transfers, introduced by those amendments, was to prolong the time within which a recordable transfer which was a voidable preference, when made, might be attacked, and that they had no effect whatever in changing the time as of which it should be judged in determining whether it was a voidable preference. Criticisms of the position there taken have been made by the trustee herein, but the necessities of this case do not require my responding to them. It is sufficient to say that I have carefully considered them, and find nothing therein to cause me to change my opinion, and that the position I there took has been approved by the appellate court of this circuit in the case of In re Klein (C. C. A.) 197 Fed. 241. The same conclusion was reached by Judge Denison in the case of Re Sayed (D. C.) 185 Fed. 962, and the appellate court of the Seventh circuit in case of Re Sturtevant, 188 Fed. 196, 110 C. C. A. 68, both of which cases were decided subsequent to Debus v. Yates, but reported earlier. There was less reason for saying that a recordable preferential transfer, which had been recorded, should be judged as of the date when recorded, and not as of the date when made, in determining whether it has relation to a present consideration or a past one, than in determining whether the other elements of a voidable preferential transfer, to wit, insolvency of the bankrupt, preference, intent to prefer, and reasonable cause to believe on the part of the transferee that the bankrupt intended to prefer, were present.

In the Eighth circuit, where the view which I combated in Debus v. Yates has been much adopted, the application of it to a deed of trust to secure a present loan was expressly denied in the recent case of In re Jackson Brick & Tile Co. (D. C.) 189 Fed. 636. It was questionable whether the amendments of 1903 applied, as the deed of trust, though recorded August 8, 1906, and within four months of the filing of the petition in bankruptcy, had been given December 2, 1902, before the enactment of those amendments, which Judge Dyer in his opinion noted. He continued as follows:

"But, even if it be assumed that the amendment of 1903 is applicable to the transfer here in question, it still seems clear that the transaction cannot properly be treated as a voidable preference because the deed of trust was given to the bank as security for a present loan, and not for an antecedent indebtedness."

He said further:

"But, while the statute postpones the time within which the transfer can be attacked, the statute cannot properly be so applied as to materially alter the essential character of the transaction. If the transfer is one which is required to be recorded, the four-month period during which it may be attacked does not begin to run until the conveyance is recorded, but, if the transfer when made was based upon a present consideration, a delay in recording the instrument does not warrant us in treating the conveyance as if it were made as security for an antecedent debt, because to do so would be to create by construction a transaction different from the actual one."

The position that the amendments of 1903 did not authorize the creation by construction of a transaction different from the actual one was against the doctrine in toto; and, because of it, Judge Dyer balked at applying it to a mortgage transfer given for a present consideration.

The mortgage here, therefore, cannot be a voidable preference under the act as it was before the amendment of 1910 to section 60b, because made for a present consideration, and that, notwithstanding the introduction of the prolonging words by the amendments of 1903 to sections 60a and 60b. But why is this so? Why is it that under the act as it then was no transfer for a present consideration could be a voidable preference? It is important to understand just why this is so. This takes us back to the act as it was before the amendments of 1903 to sections 60a and 60b. Clearly before then no transfer for a present consideration. could be a voidable preference. And this was so simply because a transfer for a present consideration did not come within section 60b. That section, then as now, was the only section of the act relating to voidable preferences. It contained a single sentence, and that a conditional one. The protasis thereof, on its surface, called for two things only—the giving by the bankrupt of a preference within a certain time, and the having, by the person to whom the preference was given, described as the "person receiving it or to be benefited thereby" or, his agent acting therein, reasonable cause to believe that it was intended to give a preference thereby. This latter thing has been held to imply a third one, to wit, the intending by the bankrupt thereby to give a preference. The apodosis was that in case of the existence of these things the preference should be voidable and recoverable. To understand what the first of these three things, from the existence of which this followed, was, it is necessary to go to the immediately preceding section 60a, the sole function of which was to define what should constitute the giving by the bankrupt of a preference. It, too, contained a single sentence, and that a conditional one. It recognized two kinds of preferences which might be given, to wit, judgment preferences, and transfer preferences. We have to do only with the latter, and hence any further reference to the former will be omitted. The protasis of the sentence as to transfer preferences also called for three things, to wit, the making by the bankrupt of a transfer of any of his property, insolvency on his part, and the enforcement thereof having the effect of enabling any one of his creditors to obtain a greater percentage of his debts than any other of such creditors of the same class. The apodosis was that, in case of the existence of these three things, the bankrupt would be deemed to have given a preference. In providing for the first of the three things called for it is not said to whom the transfer must be made. The underlying thought, however, is that it must be made to or for the benefit of the creditor, who, by the enforcement thereof, will be enabled to obtain the greater percentage; for not otherwise will he be so enabled. In the language of section 60b he must receive or be benefited by it. In 1 Loveland on Bankruptcy, p. 987, it is said that the transfer must be to a creditor. Of course, it is not meant thereby to exclude

a transfer to one not a creditor for the benefit of a creditor from being a preference. It was merely intended to emphasize the fact that the person to whom or for whose benefit the transfer is made should be a creditor. A preference, therefore, that is voidable, was, in this particular, the same as one that constituted an act of bankruptcy. Such a preference under section 3 (2) consists in the transfer by the bankrupt whilst insolvent of any portion of his property to one or more of his creditors, with intent to prefer such creditors over his other creditors. Here the letter is that the transfer should be to one or more of his creditors. But a transfer to another person not a creditor for the benefit of one or more of his creditors is within the provision just as much as a transfer to one or more creditors directly. In order, therefore, that there be a preference under section 60a, and hence that there be a voidable preference under section 60b, as well as in order that there be a preference under section 3 (2), it is necessary that the transfer be to or for the benefit of a creditor. The same thought is not always expressed exactly the same way in the act. Such is the case here. By section 1 (9) it is provided that the word "creditor" in the bankruptcy act shall, unless the same be inconsistent with the context, be construed to "include any one who owns a demand or claim provable in bankruptcy." It comes to this, then: That the transfer called for by section 60a, and through it by section 60b, is a transfer to or for the benefit of one who owns a demand or claim provable in bankruptcy; i. e., who then owns such a demand or claim. And it follows that it was only a transfer made by a bankrupt to an antecedent or pre-existing creditor, i. e., in payment of or as security for his debt, that could be a preference under sections 60a and 60b as they were originally enacted. If this is sound, then in no state of case could a transfer for a present consideration be a voidable preference under section 60b. If for cash or in exchange for other property, it could not be such because it would not be to or for the benefit of a creditor. If to secure an indebtedness then for the first time created—i. e., simultaneously with the making of the transfer—it would not be such because it would not be to or for the benefit of one who was theretofore a creditor. A sufficient reason, therefore, for the position that a transfer to secure a debt created simultaneously with its making could not be a voidable preference under sections 60a and 60b, as originally enacted, is that it did not come within them. They related only to transfers to pay or secure an antecedent or pre-existing debt. Consistent with this is the fact that section 67d provided, expressly, that in certain contingencies a lien given for a present consideration—i. e., a transfer as security—should not be affected by the act. Those contingencies were that the lien was given "in good faith, and not in contemplation of or in fraud upon" the act, and that it had been "recorded according to law if record was necessary in order to impart notice." The section itself does not affect liens given for a present consideration where either of the two contingencies named does not exist. It simply provides that liens so given where both contingencies exist shall not be affected by the act; and, so far as they are affected thereby, where either contingency does not exist, it is not by section

60b that they are affected. That this section to no extent made it so, that a transfer to secure a present debt was not a voidable preference, and that such was the case was due solely to the fact that the voidable preference section related only to transfers to pay or secure a past debt, is evident from the fact that the act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517) contained no such section, and yet it was held thereunder that in order to a preference it was essential that the transfer be to pay or secure an antecedent or pre-existing debt. Tiffany v. Boatman's Savings Inst., 18 Wall. 375, 21 L. Ed. 868. But, though such was the case, the existence of that section rendered it impossible to construe sections 60a and 60b as including a transfer to secure a present debt. So to construe it would make the two sections inconsistent.

[2] Matters remained the same they had been in this particular after the enactment of the amendments of 1903 to sections 60a and 60b. The sole change, thereby made, in section 60b consisted in omitting from the protasis of the sentence, theretofore constituting the whole of the section, any reference to the time within which the preference was given, and adding a sentence in relation to the jurisdiction of suits to recover voidable preferences. The amendment to section 60a, upon which section 60b depended, consisted in inserting in the protasis of the sentence constituting it, in connection with the first thing therein called for, to wit, the making of a transfer, the time words which had been omitted from section 60b and adding a sentence by which it was provided that, in case of a recordable transfer, such time should not expire until four months after the date of the recording thereof. The sole effect of these amendments has been heretofore stated. As thus amended, therefore, these sections did not, any more than in their original state, include a transfer made to secure a debt created simultaneously with the making of the transfer. No change was then made in section 67d. Such, then, are the reasons why the mortgage here could not be a voidable preference under the act as it was before the amendment of 1910 to section 60b. This yields us a good standpoint from which to view that amendment and determine its effect. It gives us a Pisgah view thereof. How, then, does the matter stand under that amendment? Is it ever possible thereunder for a transfer to secure a debt so created, i. e., for a present consideration, to be a voidable preference? It merely substituted another sentence for the first of the two sentences of which it was constituted after the amendment of 1903. No amendment was made to section 60a. It remained exactly as it was under the amendment of that year. That substitution made affected, somewhat· at least, the dependence that had theretofore existed on the part of section 60b upon section 60a. Seemingly it left section 60a high and dry, and performing no function. It still defined what should be the giving of a preference, but no consequence to a preference, as thus defined, is given to it elsewhere in the act. The new sentence substituted in section 60b is like the old, in that it is a conditional sentence. The protasis thereof calls for four things: The making of a transfer by a bankrupt of any of his property; insolvency on the part of the bank-

rupt; operation of the transfer as a preference; and the having by the person receiving it or to be benefited thereby, or his agent acting therein, reasonable cause to believe that the transfer would effect a preference. It requires that it be made within four months of the filing of the petition in bankruptcy, or, if it is a recordable transfer, that it be recorded within such time, and provides that if the insolvency, operation as a preference, and the having reasonable cause to believe that it would effect a preference exists either when made, or, in case of a recordable transfer which has been recorded, when it has been recorded, it is sufficient. The apodosis is that, if these four things exist, the transfer shall be voidable, and the property covered by it recoverable. It is thus seen that the giving of a preference as provided in section 60a constitutes no part of the protasis of the first and new conditional sentence of section 60b. It has been eliminated therefrom. The protasis thereof consists solely of the four things hereinbefore referred to, each of which is set forth therein specifically. The effect of the amendment has been to make it so, at least, that a recordable transfer, which has been made to secure an antecedent or pre-existing debt, and which has been recorded, may be judged as of the time when it was recorded, as well as when it was made, in determining the bankrupt's insolvency, whether the transfer operates as a preference, and whether the person receiving it or to be benefited thereby or his agent acting therein had reasonable cause to believe that it would effect a preference. In other words, in case of such a transfer, if at the time it is recorded the bankrupt is insolvent, it operates as a preference, and the transferee has such cause, however, it may have been when made, it is a voidable preference. In case the transfer has not been recorded, no other time for judging it in those particulars is provided than when it is made. Such I say at least has been the effect of the amendment. Has it had the effect, also, of making it so that a recordable transfer, which has been recorded, made to secure a debt created simultaneously with its making, is a voidable preference, if, at the time it is recorded, the three things referred to exist, on the idea that, though the consideration was a present one when the transfer was made, it has become a past one when recorded? The trustee contends that it has had this effect, and it is on this ground that he contends that under the amendment of 1910, however it is under the act as it stood prior thereto, the mortgage here is a voidable preference. I do not think that it has had this additional effect. I think its effect is limited to that conceded. The first thing called for in the protasis is the making of a transfer by the bankrupt of any of his property. It is not said to whom. It is in this particular exactly like the first thing called for in the protasis of section 60a as it was originally, and of the first sentence thereof after the amendment of 1903, which was not changed by the amendments of 1910. We have found that in that condition, though not so expressed, the underlying thought was that the transfer should be made to or for the benefit of a creditor; i. e., to a then existing creditor. There is no reason to hold otherwise as to this thing in the protasis of the first sentence of section 60b under the amendment of 1910. Though not expressed,

the underlying thought still is that the transfer is to be to or for the benefit of a creditor; i. e., to a then existing creditor. Certainly under section 60a as it now stands the transfer therein referred to must be to such a creditor. What possible reason is there for holding that the transfer referred to in section 60b, as it now stands, is not to such a creditor? The retention of section 60a in the act may have this possible effect, if none other; i. e., it may indicate that the transfer had in view in section 60b, as amended in 1910, is a transfer to or for the benefit of the same character of person as is had in view by section 60a not then amended. The argument here attempted to be made may be put this way: The first thing called for in the protasis of the amendment of 1910 is the making by the bankrupt of "a transfer of any of his property" not saying to whom. This indefinite phraseology has been carried into the amendment from section 60a as originally enacted, as it was after the amendment of 1903, and as it has continued to be since the amendment of 1910. As it was and is therein, we have seen that it means the making by the bankrupt of "a transfer of any of his property" to or for the benefit of a creditor. There is no reason why it should not be given the same meaning in the amendment. The underlying thought thereof in the amendment of 1910 as in section 60a, therefore, is that the transfer should be made to or for the benefit of such a creditor. If it had been so expressed, there could have been no room to claim that a transfer made to secure a debt then created—i. e. for a present consideration—could in any contingency be a voidable preference under section 60b as amended in 1910. Though it has not been so expressed, such must be taken to be its meaning, and the same result follows as if it had been so expressed. Two considerations, in addition to the one already alluded to, to wit, that the indefinite phraseology has been taken from a source where it had such meaning, exists for taking this to be its meaning. One is that the transfer had in view is a transfer to pay as well as one to secure. A transfer to pay cannot be other than to pay a pre-existing debt. A transfer for cash cannot possibly be a preference either when made or when recorded. If, then, the transfer had in view is a transfer to pay a pre-existing debt, so, one to secure must be to secure such a debt. The other is the fact that, except with a slight modification, which to no extent changed its effect, section 67d was allowed to remain in the act by the amendment of 1910. That provision, before those amendments, was to the effect that liens given for a present consideration should in certain contingencies not be affected by the act. The modification thereof made by the amendment of 1910 was to add the words "to the extent of such present consideration only." But this made no real change, for prior to that amendment the section had been given this construction. 1 Loveland on Bankruptcy, p. 952. This provision and the construction which the trustee would place on the amendment of 1910 of section 60b cannot stand together. It is to the effect that liens given for a present consideration shall in the contingencies named, to the extent of the present consideration, not be affected by the act. The construction which the trustee would place thereon is that if, at the time such a lien is recorded, the bank-

rupt is insolvent, the lien operates as a preference, and the transferee has such reasonable cause to believe, though both contingencies exist, the lien is affected by the act; i. e., it is a voidable preference. The presence of 67d thus clears the amendment of 1910 to section 60b of any ambiguity that may be in it, considered by itself, in this particular.

The trustee, proceeding upon the idea that the fact that section 67d was amended at the same time in 1910 as section 60b was has no bearing on the matter, because the amendment thereto made no change, argues that the amendment of 1910 to section 60b, being the later law, impliedly repeals section 67d in so far as it conflicts therewith, citing Sutherland on Stat. Const. (1904) § 247. He would have it, therefore, that instead of every lien given for a present consideration in good faith and recorded according to law, if recordable, not being affected by the act as provided by section 67d, that this is so, provided at the time it is recorded it is not the case that the bankrupt is insolvent, the lien operates as a preference, and the lienholder has reasonable cause to believe that it would effect a preference, in which case it would be affected by the act, thus to this extent qualifying or modifying section 67d. But this argument begs the question, to wit, that there is a conflict between the two provisions. According to the Sutherland citation relied on, in order to an implied repeal, it is essential that the terms and necessary operation of the later act cannot be harmonized with the terms and necessary effect of the earlier one. Now the amendment of section 60b in 1910 in its terms says nothing whatever as to transfers to secure debts created simultaneously with the making of the transfer—i. e., for a present consideration—and it can be made to include such a transfer only by holding that where it calls for a transfer by the bankrupt of any of his property, without saying to whom, it was intended to include such a transfer as well as a transfer to or for the benefit of a then existing creditor, the only sense in which those words had theretofore been and were then used in section 60a. The necessary effect of the amendment is not to include such a transfer, and there is not the slightest indication that it was intended to include it. It is only by giving the words a broader meaning than given them in the source from which they were drawn that it can be made to include it, and the fact that thereby section 60b will be brought into conflict with section 67d is sufficient reason for not so doing. That it was not thought that the amendment of 1910 had any qualifying or modifying effect on section 67d is evident from the fact that it was amended at the same time so as to make it say in words what it had theretofore been held to mean, without any indication that it was thought to have any lesser effect after the amendments of 1910 than before.

The trustee in this connection has much to say on the question whether the mortgage in question here is protected by section 67d. He thinks that, because it was not promptly recorded, it does not come within its protection. But I am concerned here only with the question whether it is a voidable preference under section 60b, and the allusion to section 67d is to enforce the position that it is not, for thereby section 60b would be brought into conflict with it. I am not

now concerned with the question whether it is protected by section 67d. Nor do I think it will ever be necessary to determine that question. The only question that can come up is whether the act requires that it should be suppressed. If some provision thereof does not so require, it needs no protection from section 67d. I am therefore constrained to hold that the mortgage in question is not a voidable preference within section 60b, as amended in 1910. It is not thereby required that it be suppressed. In the case of In re Soudan Mfg. Co., 113 Fed. 804, 51 C. C. A. 476, Judge Seaman, in referring to the act as it was originally, said:

"The policy of the bankrupt law respecting liens for a present consideration differs radically from its treatment of preferences generally or as security for an existing indebtedness."

I find no evidence in the amendments of 1903 and 1910 of any purpose to make any change in this difference so as to make it less radical. The amendments of 1903 to sections 60a and 60b indicate a purpose to prolong the time in which a recordable transfer in payment of or as security for an existing indebtedness may be attacked, and none other. And the amendment of 1910 to section 60b indicates a purpose to render such a transfer, which has been recorded, so that it can be judged as of the date when recorded, as well as when made, in determining whether it effects a preference and the transferee has reasonable cause to believe that it does so and none other.

[3] This brings us to the other ground of attack, not involving the meritoriousness of the mortgage or that of the debt which it was given to secure, heretofore referred to. It is based on section 496 of the Kentucky Statutes, which is in these words:

"No deed or deed of trust or mortgage conveying a legal or equitable title to real or personal estate shall be valid as against a purchaser for a valuable consideration without notice · thereof or against creditors until such deeds shall be acknowledged or proved according to law and lodged for record."

Most of the general creditors of the bankrupt became such subsequent to the making of the mortgage, and before it was recorded. I assume that they so became without notice of its existence, though it is arguable that they did not. Their debts exceed the surplus proceeds of the mortgaged property after satisfying the first mortgage. After the mortgage was recorded and before the proceeding was instituted —i. e., within the 10 days intervening between these two events— these creditors brought suit in the proper state court, and obtained attachments which were levied on the mortgaged property. These attachments were in full force at the time this proceeding was instituted. The trustee contends that by virtue of that statute, had this proceeding not been instituted, the mortgage would have been void as against these creditors because not recorded when the debts were created and they had no notice of its existence, and therefore that it is invalid as against the trustee, presumably, though he has not so expressed himself, for the benefit of all the general creditors. He has not made clear the exact basis upon which he is entitled to avail himself of this right of these creditors. He cannot do so through their attachments, because no order was made under section 67f of the

bankruptcy act preserving them for the benefit of the estate. It is questionable whether he can avail himself thereof under section 67a, as it is possible that it is limited to liens which are invalid as against all the general creditors of the bankrupt, which is not the case with the mortgage in question. As we shall presently see, the Kentucky statute quoted does not invalidate an unrecorded instrument of writing of the character called for as against all the general creditors of the maker thereof, but only as against certain of them. But, however this may be, it is certain that he can avail himself thereof under the amendment of 1910 to section 47a (2). Thereby the trustee, for the benefit of the estate, is given as to all the property in the custody of the bankruptcy court all the rights of a creditor holding a lien by legal or equitable proceedings therein—i. e., the same rights as those attaching creditors had—and this amendment is applicable to this case, however it may be as to the amendment to section 60b. In re Hammond (D. C.) 188 Fed. 1020. The fact that it does apply thereto is not conclusive of the fact that the amendment to section 60b applies, for different considerations are involved in the two cases.

It follows then that the correctness of this ground of attack depends entirely on the soundness of the trustee's contention that, had not bankruptcy intervened, the mortgage would have been invalid as to those creditors, and the property covered thereby would have been subject to their attachments free therefrom by virtue of that statute. To this contention I now direct my attention.

The soundness thereof depends on who are creditors within the meaning of the statute. As heretofore noted, it does not include all the general creditors of the maker of the instrument of writing whose validity is involved. It is well settled by decisions of the Court of Appeals of Kentucky that it does not include creditors who became such before its making, hereafter termed "antecedent" creditors. It is limited to creditors who became such subsequent to its making and before its recording, hereafter termed "subsequent" creditors. Nor does it include all subsequent creditors. It is further limited to such creditors who became creditors without notice of its existence. I will not now refer to the decisions by which these limitations upon the word "creditors" in the statute became established. That statute, substantially as it is now, has been in existence from an early period in the history of the state, and it is only until recent years that those limitations have become established. In the course of the discussion I will note when this came about. In so far, then, those creditors answer the description of the statute. They are subsequent creditors without notice. The question then comes to this: Does the statute include all subsequent creditors without notice, or is it further limited to subsequent creditors without notice who by their own activity —i. e., through an execution, attachment, or suit in equity on a return of nulla bona—have acquired a hold or lien on the property covered by the instrument of writing, and that before it has been recorded? If there is such an additional limitation, then the contention under consideration is not sound, for, though those creditors did by their attachments acquire a hold or lien on the property covered by

the mortgage, they did not acquire it until after the mortgage was recorded. This, then, is the crucial question on this branch of the case. It resolves itself into two. One is whether section 496 includes subsequent creditors without notice who have not acquired such a hold or lien or is limited to such as have. The other is whether, if it is so limited, does it include such creditors who have acquired such a hold or lien after the instrument in writing was recorded.

Considerable confusion exists as to just what is to be taken as the position of the Court of Appeals on the first of these questions. It is so great, and the task of clearing it up is one that so needs to be done, that I feel called on to make an effort to do so, though it will greatly extend this opinion. It necessitates a consideration of all of the decisions of that court dealing with that part of the statute, and an incisive criticism of each one of them.

At the outset I would note that before Wicks Bros. v. McConnell, 102 Ky. 434, 43 S. W. 205, the words "or against creditors" had been practically eliminated from the statute. This is how I make this out. The only possible way in which a general creditor can collect his debt is by subjecting his debtor's property to the payment thereof; i. e., causing it to be sold and its proceeds to be so applied. This he can do by a sale under an execution issued on a personal judgment against the debtor, or under a judgment of the court in furtherance of an attachment levied thereon, or in equity upon a return of nulla bona. Before Wicks Bros. v. McConnell it had been settled that a purchaser at an execution sale, whether the creditor or a third party, acquired no title as against an instrument of writing of the character called for in section 496, though the same had not then been recorded, if, at the time of his purchase, he had actual notice thereof. The hold or lien acquired by the levy of the execution was of no avail to protect him as against the instrument. And the fact that the execution creditor was a subsequent creditor without notice made no difference. It was sufficient to subordinate the rights of the purchaser to that of the holder of the instrument that he had actual notice thereof when he purchased. In such a case, therefore, the provision of the statute relating to creditors was of no force. And, where the purchase was made without notice of the instrument of writing, that portion of the statute was not needed to protect the purchaser. The other portion relating to a purchaser for valuable consideration without notice was sufficient to that end. Though there were no decisions involving sales under judgment of court, in furtherance of an attachment, or in equity upon a return of nulla bona, there was no reason for differentiating them from sales under execution, and hence it must be taken that they were subject to the same rule. And one decision went so far as to hold that actual notice to the purchaser was not required to subordinate his rights to that of the holder of the instrument of writing. Constructive notice, caused by recording the instrument after the hold or lien had been acquired by the creditor, was sufficient. So it is that I say that at the time of the decision of Wicks Bros. v. McConnell the decisions of the Court of Appeals had practically eliminated the words "or against creditors" from the statute. That court

did not start that way. And it is most interesting to note how it was that it got diverted from the path of truth.

The cases to be considered, in order to bring out what I have said as to the decisions before Wicks Bros. v. McConnell, are as follows, to wit: Helm v. Logan's Heirs, 4 Bibb, 78; Campbell v. Moseby, Litt. Sel. Cas. 359; Graham v. Samuel, 1 Dana, 166; Morton v. Robards, 4 Dana, 258; Halley v. Oldham, 5 B. Mon. 235, 41 Am. Dec. 262; Righter v. Forrester, 1 Bush, 281; Low v. Blincoe, 10 Bush, 331; Baldwin v. Crow, 86 Ky. 679, 7 S. W. 146. In Helm v. Logan's Heirs the subject of the controversy was negroes; in Baldwin v Crow, a piano; and in the other cases land. In Helm v. Logan's Heirs, Graham v. Samuel, Righter v. Forrester, and Baldwin v. Crow the instrument in writing involved was a mortgage, though in Graham v. Samuel it was on its face an absolute deed. In Morton v. Robards and Low v. Blincoe the instrument was in reality, as on its face, an absolute deed, and in Campbell v. Moseby and Halley v. Oldham it was an executory contract or title bond. In each of these eight cases one party to the controversy was the holder of the particular instrument of writing there involved. In all but Graham v. Samuel and Baldwin v. Crow the other party to the controversy was a purchaser at sale under execution of the property covered by the instrument of writing. In each instance the instrument of writing had not been recorded at the time of the levy of the execution. This was the case, also, at the time of the sale except in Righter v. Forrester, where the mortgage had then been recorded, and in Low v. Blincoe, where such was the case as to the deed. The mortgages and deeds were not recorded, not at all in all cases but Righter v. Forrester and Low v. Blincoe, and not until after the levy of the execution in those cases, either purposely or through neglect, which not appearing. The execution purchaser in each case except Halley v. Oldham and Righter v. Forrester had actual notice of the instrument of writing at the time of his purchase. In Halley v. Oldham he had such notice at the time he received the sheriff's deed, but not at the time of his purchase, and in Righter v. Forrester it does not appear that he had notice as early as that. In Helm v. Logan's Heirs and Graham v. Samuel the purchaser was a third party, but in Graham v. Samuel it is probable that he was acting as agent for the execution creditor. Such was probably the case in Righter v. Forrester. In the other cases he was the execution creditor. In Graham v. Samuel and Baldwin v. Crow the party to the controversy other than the holder of the instrument of writing was the creditor himself. In Graham v. Samuel he had brought suit in equity upon a return of nulla bona to subject the land to the payment of his debt, and made the holder of the instrument a defendant, and sought to have it set aside. At the time he brought his suit, the mortgage, in form an absolute deed, had been recorded. The effect of this circumstance will be considered later, but until then it will be treated as if such had not been the case. In Baldwin v. Crow the holder of the mortgage brought suit against the sheriff who had levied on the piano and the execution creditor defended the suit. In Graham v. Samuel the creditor was a subsequent creditor without notice. In

Baldwin v. Crow he was an antecedent creditor. In none of the other cases does it appear whether the creditor was an antecedent or subsequent, though in Morton v. Robards it is most likely that he was antecedent. In Helm v. Logan's Heirs and Halley v. Oldham the execution purchaser and in Graham v. Samuel the creditor was held to have the better right. In the other cases the holder of the instrument of writing involved was held to have it. So much as to the resemblance and difference of these cases. They should now be considered separately.

Helm v. Logan's Heirs, the first case to arise under the statute, as stated, involved a controversy between an execution purchaser, not the creditor, and the holder of a mortgage, outstanding at the time of the levy, not then or thereafter recorded, but of which the execution purchaser had notice at the time of the sale as to which had the better right to certain negroes. It did not appear whether the creditor in the execution was an antecedent or subsequent creditor. It was just as likely that he was an antecedent creditor, or, if subsequent, that he was such with notice as that he was a subsequent creditor without notice. It was held that the execution purchaser had the better right. Judge Owsley said:

"As against Caldwell (the execution creditor), therefore, who is proven to have been the creditor of Ballinger (the execution debtor), that mortgage could have no probable effect. But it is contended that, although the mortgage may be void with respect to creditors, yet it cannot be so considered as to purchasers with notice; and, as Logan made his purchase from the sheriff with notice of the mortgage as respects him and his representatives, it is urged the mortgage must prevail. This doctrine cannot be admitted to be correct. Nothing could be more absurd than the recognition of such a principle. What would be the consequence? As to creditors the mortgage is void, but as to purchasers under the execution of the creditor with notice the mortgage it is contended is valid. The creditor cannot enforce the collection of his demand without execution. There must a purchaser intervene. If no other person becomes the purchaser, the creditor will be left to the alternative either to purchase himself or lose his demand; and, if he purchases, he thereby loses his character of creditor, and, according to the doctrine contended for, as a purchaser with notice cannot be protected. A doctrine fraught with such consequences we are not prepared to recognize. And we think the mortgage of Helm not only invalid as respects creditors, but must be so held with respect to purchasers under the execution of creditors."

It must be conceded that this reasoning is unanswerable, at least, in a case where the creditor is a subsequent creditor without notice. In such a case notice to the purchaser at the time of sale would be to no purpose. But in the light of the present position of the Court of Appeals Judge Owsley went too far, if the creditor in that case was an antecedent creditor or a subsequent one with notice. He decided the case as if this made no difference; and in so doing gave the words "or against creditors" too wide a scope.

In Graham v. Samuel, as stated, the controversy was between a creditor who had brought suit in equity upon a return of nulla bona to subject the land to payment of his debt and the holder of a mortgage in form an absolute deed outstanding at the time the suit was brought, which for the time being is treated as not then recorded. The holder

of the mortgage was made a defendant to the suit, and in it the mortgage was sought to be set aside as void under the statute as against plaintiff. The debt was created after the execution of the instrument and without notice of its existence. It was held that the statute rendered the mortgage void as against the creditor, and that he had the right to subject the land to the payment of his debt so that a purchaser at a sale would acquire a clear title, just as in Helm v. Logan's Heirs it was held that the mortgage there involved was thereby rendered void, and the purchaser acquired title to the negroes at the execution sale, notwithstanding his knowledge thereof. But a false note had been struck in the intervening case of Campbell v. Moseby. The opinion therein when delivered was not for publication. It came to be reported pursuant to the act of the Legislature to which we owe Littell's Select Cases. It was the false note struck thus that caused the diversion from the path of truth to which I have alluded. It had no effect on Graham v. Samuel, but it did have effect later. This is the second case reported in Littell's Select Cases, the reporting of which I have noted has brought disharmony in the decisions of the Court of Appeals. The other one is that of Bryan v. Beckley, Litt. Sel. Cas. 91, 12 Am. Dec. 276. I considered it somewhat in detail in Davis v. Commonwealth L. & L. Co. (C. C.) 141 Fed. 740, 765. The controversy in Campbell v. Moseby was between a purchaser under an execution sale and the holder of an executory contract or title bond outstanding at the time of the levy of the execution. As the holder of the bond he had an equity in the land. At the time of the sale the purchaser had actual notice of this outstanding equity. It was held that the right which he acquired was subordinate to that of the holder of the equity. In so holding there was no conflict whatever with the case of Helm v. Logan's Heirs. Nor did the case of Graham v. Samuel conflict therewith. The decision was undoubtedly sound. A title bond as the statutes then stood was not a recordable instrument. It was not such an instrument of writing as was covered by the statute in question. It covers only a deed or a deed of trust or mortgage and a title bond is neither. The statute, therefore, had no application whatever to the case. It was controlled by the general principles of law applicable in a contest between the holder of an outstanding equity in real estate and the holder of the legal title. If the latter acquires such title for a valuable consideration and without notice of the equity, he takes it clear of the equity, but with notice he takes it subject thereto. This applies as well to purchasers at involuntary sales under execution as at voluntary sales. The creditor in that case, therefore, has no right as against the equity of the holder of the title bond, in virtue of which the purchaser at the execution sale could acquire the better right. The opinion therein was delivered by Judge Owsley, who delivered the opinion in Helm v. Logan's Heirs. He makes no reference to the earlier case which was decided about six years before. The ground of the 'ecision he put thus:

"But in this case the Bradleys must be admitted to have had notice of Moseby's equity when they purchased, and, as all other purchasers with notice, must hold the land subject to that equity."

201 F.—62

He stated a possible objection to the decision arising from the statute thus:

"And it may possibly be thought by some that as the writing under which Moseby asserts his equity was not proved and lodged with the clerk to be recorded, according to the provisions of the act to which we have referred, his equity was not good against the creditors of Campbell, and ought not to prevail against the Bradleys, who are purchasers under an execution which issued in favor of a creditor of Campbell."

To this he answered most aptly:

"But it should not be forgotten that the statute has no application to executory contracts for land. * * * According to the statute, the legal title as respects the interest of creditors will remain as though no conveyance had been made, unless the conveyance be made, proved, and lodged with the clerk to be recorded as directed by the provisions of the statute."

Had he stopped here, all would have been well. But this he did not do. He gave expression to this dictum, to wit:

"The mere failure to prove and record the deed of conveyance as required by the statute is not per se fraudulent, and if made on a valuable consideration, although not regularly proved and recorded, vests in the grantee a specific equity to have the title perfected, so as to be operative against all the world; and the holder of such an equity is always preferred in any contest with the general creditors of the vendor or subsequent purchasers with notice."

He was led to give expression to this dictum by a consideration of the English statute concerning the registration of certain deeds and adjudications of the English courts thereunder  That statute provided that deeds of a certain character should be adjudged fraudulent and void against any subsequent purchaser or mortgagee for a valuable consideration unless registered. Concerning it and the adjudications thereunder he said:

"It will be perceived that by this act nothing is said about the subsequent purchaser having notice of the prior conveyance; but the prior deed is expressly declared to be void, unless registered within the time prescribed by the statute. Under that statute, however, a question occurred whether a person buying an estate with notice of a prior incumbrance not registered should be bound by such incumbrance, although he had obtained priority at law by registering his deed. It was held that by force of the statute the subsequent purchaser was vested with the legal title, but, having notice of the prior incumbrance, he was not bound by it and in equity compellable to surrender his title."

But that statute had no provision as to the validity of such deeds as against creditors like the statute here. It concerned solely purchasers and mortgagees for a valuable consideration. It said nothing on the subject of notice as to them. The English courts held that, though the statute provided that an unregistered deed should be void as against any subsequent purchaser or mortgagee for a valuable consideration, it was not void as against such purchaser or mortgagee with notice of its existence. In effect, they construe the statute to mean this, though they did not put it that way. Thus construed, the statute was exactly the same as that part of the statute not involved here, which protects a purchaser for a valuable consideration without notice. In enacting that part of the statute the Legislature of Ken-

tucky put in force here the English statute so construed. To so argue, then, from this action of the English courts, is the same thing as to hold that the part of the statute not involved here rendered nugatory that part which is. Then as to Judge Owsley's statement that an unrecorded deed of conveyance for valuable consideration vests in the grantee "a specific equity" I would submit that such is not the case. It vests in him the legal title good except as invalidated by the statute. Were there no such statute, it could not be said that he had a "specific equity." He would have the legal title good as against all, and nothing else. Because of the statute, he still has no more than the legal title, but it is no longer good as against all. It is good against all except those as to whom it is invalidated. It was this action of the English courts and this notion of "a specific equity" which led to this dictum. Judge Mills dissented from the holding in Campbell v. Moseby. Seemingly his position was that, though a title bond did not come within the letter of the statute in that it was not a deed or deed of trust or mortgage, the only instruments covered by the statute, it did come within its spirit and intent. He said:

"A deed of conveyance, acknowledged or witnessed, and not deposited to be recorded or improperly placed on record, has I conceive in the contemporaneous construction of the act not been deemed valid against a fieri facias. How, then, can an instrument of less validity, of less force, either in law or equity, an executory contract only, be effected? It may be said that the first passes the legal estate, and is executed while the latter passes an equity only. To this it may be replied that the first described instrument passes the equity also and more; and the major will include the minor. If an instrument passing the equity only can be enforced, I see no reason why an unrecorded deed may not be valid against a sale under a fieri facias, not only in equity, but also at law."

He concluded with this argument ab inconvenienti, to wit:

"I cannot conceive of a more facile mode of placing land beyond the reach of creditors than that of placing the legal estate in the hands of one and the equity in another. The equity holder is safe for his estate cannot be touched, nor will a court of chancery according to the decision of this court in the case of Buford v. Buford, 1 Bibb, 305, compel him to bring his title into reach; and he runs no risk from the debts of his vendor, for, if his estate is sold, it is only to give notice to the purchaser in time, and make him surrender it. Thus both are safe, while one of them enjoys the estate and the creditors of both remain unpaid."

In the case of Graham v. Samuel, Judge Nicholas, who delivered the opinion therein, referred to the dictum in Campbell v. Moseby heretofore quoted. He responded to it thus:

"No authority is cited in support of this dictum, and it will be found on examination not to have been called for by the case then before the court. It would be difficult to reconcile the opinion thus intimated, or the reasoning adduced in its support with the case of Helm v. Logan's Heirs, 4 Bibb, 78, where the point was directly presented for adjudication, and it was expressly decided that neither the creditor himself nor a purchaser under his execution were affected by notice of an unrecorded deed. 'It is also there said that nothing could be more absurd than the recognition of a contrary principle."

As to the supposed analogy with the English decisions under the English statute, he argued that all that it required was that the creditor should have become such subsequent to the execution of the deed;

without notice, at the time of his so becoming, of its existence, which was the case there.  He said:

"The principle upon which the English decisions on this subject are based is that the statute was made for the protection of innocent bona fide purchasers without notice, and that as a subsequent purchaser with notice of an unrecorded deed is not an innocent, but a mala fide, purchaser, he is not entitled to the protection of the statute.  The principle is just in itself, and of undoubted equitable parentage.  But it is far from warranting the taking from creditors indiscriminately the protection afforded them by the statute against unrecorded deeds, because they may have notice of such deeds at the time they come to enforce their demands, without reference to the time when the debt was contracted.  On the contrary, if the principle be of pure equitable origin and indubitable justness that we admit it to be, it must require that the creditor should have had notice at the time the debt was contracted, when according to the intendment deducible from the whole scope and policy of the statute he was liable to be prejudiced by the nonrecording of the deed.  Notice at any subsequent period could with no show of equity or propriety be considered so far to affect his conscience as to deprive him of the protection against a secret and unrecorded conveyance which is extended to him by the very letter of the act.  We should make the law 'palter' with him and cheat him with the mere 'word of promise' were we to determine that, after having declared all unrecorded deeds should be void as against him, when he came to demand the benefit of this declaration, its whole fruition should be snatched from him by the production of notice of the unrecorded instrument.  It would be mere mockery to hold out the idea of protection to creditors against secret conveyances, and yet, when they came to enforce their demands, to permit the secret purchaser to deprive them of protection by the exhibition of an unrecorded deed."

Though in response to the argument from analogy it is said that all that it required was that the statute should be limited to subsequent creditors without notice, and in that case the contesting creditor was such a creditor, it was not held that the statute should be so limited.  Helm v. Logan's Heirs, where, as we have seen, it was not so limited, was approved without qualification.  And it may be that the wide scope which these two cases gave the statute was not without some influence in causing the court in the cases subsequent thereto to go to the opposite extreme.  A hint, however, of this limitation of the statute, was thus given in Graham v. Samuel, but it was never taken.  As we shall see, it was not because thereof that the court finally made such limitation.

In Morton v. Robards the controversy was between an execution purchaser and the holder of a deed outstanding at the time of the levy of the execution, though not recorded.  The purchaser was a third party, but possibly acted as agent for the execution creditor in the purchase.  It does not appear when the execution debt was created, but it is most likely that it was created before the execution of the deed.  The deed was made in execution of a title bond executed over 36 years before.  It was held that the holder of the unrecorded title deed had the prior right.  This holding was not based on the fact that the creditor in the execution was an antecedent creditor.  As stated, it does not clearly appear that he was.  It is clear, however, from a consideration of the reasoning upon which the decision was based that the fact that the creditor was a subsequent creditor, though without notice, would have made no difference in the decision.  In

that the unrecorded deed had been made in execution of a title bond the case had a feature in it which may be said to differentiate it from Helm v. Logan's Heirs, and Graham v. Samuel, and to liken it to Campbell v. Moseby, and such as to require the conclusion reached. The argument may be put thus. The effect of the statute was to avoid the deed. The effect of the avoidance of the deed was to revive the title bond, and this to require that the case be decided as if no deed had ever been made. In that contingency the case would come within the doctrine of Campbell v. Moseby, and there would be no escape from the conclusion that the holder of the unrecorded deed should be given the prior right. Judge Ewing, who delivered the opinion, was undoubtedly affected to a considerable extent by this line of reasoning. He noted that the statute did not cover title bonds, and said: "The act concerns legal conveyances only." And he continued thus:

"A bond for a conveyance is not good as a legal title, yet valid as an equity. If it were the object of the Legislature to forfeit the equity, as well as the legal title for the benefit of purchasers and creditors, it could not well have escaped their observation that it was necessary to provide for the recording of secret bonds for a title and for the forfeiture of the equity of the holder in case of a failure, yet no provision is made with respect to bonds. We cannot conceive—whether we look at the language of the act or the evil existing and intended to be remedied—that it was the object of the Legislature to affect the equity of the holder in the one case or the other. It would be strange to contend that the equity of the holder of a bond is good, yet if he attempted to consummate his legal title, but failed, that he forfeits that equity, which he unquestionably would have held under his bond, in case no attempt had been made. We therefore conclude that the statute only takes from the holder of an unrecorded deed his legal priority or annuls his legal advantage over the general creditor, but leaves him to contest with him his prior equity."

Possibly the argument was not sound because by the execution of the deed the title bond became functus officio. Thereafter the rights of the holder of the deed were measured by his deed. He had such rights as it conveyed and none other, the avoidance of it by the statute not reviving the title bond. I am not concerned, however, to determine whether the argument is sound. I simply note that Judge Ewing seemed to think that it was, and was affected thereby. But had there been no previous title bond Judge Ewing would have held exactly as he did. The decision was not placed on this ground. It was held that the decisions in Helm v. Logan's Heirs and Graham v. Samuel were erroneous, not in giving too wide a scope to the statute, but in recognizing that in any contingency the purchaser in those cases would have had the better right, and that the dictum in Campbell v. Moseby, heretofore quoted, stated the true doctrine.

Judge Ewing said:

"There has been some oscillation in the decisions of this court on the question involved in the record."

He thereby indicated that he thought the question involved therein had been involved in the previous decisions. He then noted what had been decided in Helm v. Logan's Heirs and Graham v. Samuel on the one hand, and that, on the other hand, in Campbell v. Moseby, the court "had broadly asserted the opinion that the equity of the pur-

chaser by unrecorded deed was superior to and would prevail in a contest with the general creditor, or a subsequent purchaser under execution with notice," and then said:

"Upon a full review of these decisions and comparison of them with the English decisions upon their registration acts, we are inclined to the opinion expressed in Campbell v. Moseby."

The way in which he made out that the dictum in Campbell v. Moseby was sound was substantially the way in which it had been upheld therein. The holder of the unrecorded deed had a specific equity. The avoidance of the deed did not affect this equity, as this equity was not within the statute. If, then, the purchaser at execution sale had notice of it at the time he purchased, the right thereby acquired was subordinate thereto, just as the purchasers' right in Campbell v. Moseby was subordinate to the outstanding equity of the holder of the title bond in existence at the time of the levy of the execution, of which he had notice when he purchased. He said that it seemed to have been the intention of the Legislature, not only to limit the statute to legal conveyances only, but "to leave untouched the equity of the parties." He said further:

"The conveyance or legal title may not be good, and yet the equity of the holder be unimpeachable."

And still further:

"And as a bond is evidence of a specific equity so a deed, though it is made to lose its legal priority by not being placed on the record in time, yet is evidence of a purchase for a valuable consideration, therefore evidence of an equity of as high a grade as a bond."

And still further:

"If the prior incumbrancer is merely deprived of his legal advantage, and thrown back upon his equity, the prior equity must prevail, unless the junior equity be united with the legal title acquired without notice of the prior equity. By well-established principles in a contest between mere equities the senior equity must prevail over the junior. But the junior equity coupled with the legal title fairly acquired without notice will prevail over the senior equity. And this is the only advantage which the general creditor may acquire under the recording statutes; namely, the privilege of arming himself with the legal title and with all the legal as well as the equitable advantages, which it may afford him in a contest with the prior equity. The general creditor has no right to the land sold or any specific lien upon it at the time when his debt is contracted. He has neither jus in re, nor ad rem, nor any claim in law or equity to the land attempted to be sold under execution. He has no claim to the thing until he has placed his execution in the hands of an officer, and perhaps not until he has levied it. And this lien is generally only a lien operating against the vendor and execution creditor, and not an outstanding senior equity in the hands of a stranger. So, if an attachment in chancery be levied on the property of a debtor, it will not overreach an outstanding equity in the hands of a stranger. Besides, the levy of an execution creates a mere lien, which may never be enforced; and the legal title to the property is never completed until a sale and conveyance. And in this case as all others the legal title being acquired with notice of a pre-existent equity will be made to yield to the prior equity in a court of chancery."

And finally he said:

"Though our statute postpones or annuls the legal title acquired by an unrecorded deed in favor of creditors, it gives to the creditors' demands no high-

er dignity or greater efficacy than they had before. It neither gives, nor was intended to give, to the creditor any lien or equity upon the property of the debtor which he had not by the terms of his contract. The statute could not, therefore, in the language of the court in the case of ·Graham v. Samuel, be said 'to palter' with him, and to 'cheat him with mere word of promise.' No promise is made to him that he shall have a lien, equitable or legal, on the specific property embraced in an unrecorded deed. Or that he shall have the privilege of making his debt out of the land thus conditional. This would be to promise him, what he had not secured by his own contract, and what the Legislature would, perhaps, have no constitutional power to afford. But that the statute has promised him to sweep away the legal obstruction which the holder of an unrecorded deed has placed in his way, and to enable him to gain the vantage ground which the legal title would afford him in a contest with the prior incumbrancer. And this, promise is redeemed by the construction which we have given to the act."

I have quoted thus fully from Judge Ewing's opinion in order that the exact basis of his position may be grasped. To repeat, it is that the holder of an unrecorded instrument of writing of the character called for by the statute has a specific equity apart from the writing, which is unaffected by the statute because it is limited to the writing. This equity is just as much unaffected by the statute as the outstanding equity of the holder of a title bond not covered by the statute who has nothing that is affected by the statute. If, then, the purchaser at execution sale has notice of this specific equity at the time of his purchase, he takes subject thereto, just as much as he does to the outstanding equity of the holder of the title bond.

The fallacy of this argument lies in the position that the holder of an unrecorded instrument of writing of the character called for by the statute has "a specific equity" apart from the instrument. As before, I submit that he had nothing apart from the writing. The writing represents all the right he has. This is so, even if it has been executed in performance of a previous executory contract, which by its execution comes to a final end. This specific equity arose out of the ashes of the unrecorded instrument of writing. It was a figment of Judge Owsley's brain, accepted by Judge Ewing. It had no objective existence like that of the holder of a title bond which has been unexecuted. The statement of Judge Ewing as to what the statute had not and had promised the creditor is correct, save in so far as he stated that it promised to "enable him to gain the vantage ground which the legal title would afford him in a contest with a prior incumbrancer."' If a subsequent creditor without notice, he needed no such vantage ground. And, if an antecedent creditor, he had such vantage ground under the other part of the statute relating to a purchaser for a valuable consideration without notice. In thus creating such an equity and giving such effect to it he made the part relating to creditors of no effect. If his position was correct, in no event would the instrument of writing be void against creditors as such. It would be void against purchasers at sales to subject the property to their debts only, and against them only in case they purchased without notice, and this it would be under the branch of the statute relating to purchasers. without notice.

Thereafter the position thus taken in Morton v. Robards continued to be the law until the decision in the case of Wicks Bros. v. McConnell. The conflict between the decisions in Morton v. Robards and those in the earlier cases of Helm v. Logan's Heirs and Graham v. Samuel was recognized. No attempt was made to think the matter out and determine where the truth lay, but Morton v. Robards, the latest of the three, was accepted without question as being sound. In Halley v. Oldham the controversy was between an execution purchaser and the holder of a title bond. It was therefore like Campbell v. Moseby, in that it did not involve the statute. It differed from that case in that the purchaser did not receive notice that the bond was outstanding until after he had paid or become bound for the purchase money, but before he had received his deed from the sheriff. It was held that it came too late, and that the execution purchaser had the prior right. In order to affect him, it was necessary that he should have received notice before paying or becoming bound for the purchase money. It was recognized that in case of ordinary purchases "a second purchaser is held bound by the prior equity, though he may have made his contract and fully paid the purchase money before he has notice of it, provided he has such notice before his own equity is clothed with the legal title." And the case in hand was differentiated from such a case on the ground that the execution purchaser had "an inchoate legal title" which when he obtained his deed related back to the time the execution was placed in the hands of the sheriff. Reference was made in Judge Marshall's opinion to the cases of Helm v. Logan's Heirs, Graham v. Samuel, and Morton v. Robards, though they had no relevance to the case. The first two were classed together, and the latter with that of Campbell v. Moseby, though this was right only in virtue of the dictum in that case.

In Righter v. Forrester the controversy was between an execution purchaser and the holder of a mortgage unrecorded at the time of the levy of the execution, but recorded before the sale. It does not appear whether the creditor in the execution was an antecedent or subsequent creditor. It was just as likely that he was one as the other. Nor does it clearly appear whether the purchaser was the creditor or a stranger, but he probably was the latter. It was held that the mortgagee had the prior right, though the execution purchaser had no actual notice of the mortgage at the time of his purchase. Constructive notice from its then being of record was held sufficient to charge him. Judge Hardin said that the sale and conveyance under the execution operated to transfer to the purchaser "such equitable rights as the creditors acquired by virtue of the issual and levy of their execution." "But," he continued, "whether the rights so acquired were superior or subordinate to that of the mortgagee would seem to depend on the legal effect of the mortgage before it was recorded. * * * If, although it was inoperative as a legal conveyance of the title, it was effective to invest the mortgagees with an equity in the land, though liable to be defeated by a prior equity, or even a junior equity when united with the legal title, acquired without notice, as its creation was prior in date to the delivery to the sheriff of the execution under

which Troutman purchased the equity of the latter, it must be held to be subordinate to that of the mortgagee."

We find at work here again the idea of a "specific equity," first broached in Campbell v. Moseby, and emphasized in Morton v. Robards, which had no objective existence as in case of that of the holders of the title bonds in Campbell v. Moseby and Halley v. Oldham, but had a subjective existence only; i. e., in the minds of the judges who gave expression to it. Judge Williams dissented. He drew a distinction between an unrecorded deed and an unrecorded mortgage, in that the latter only created a lien, and did not pass the legal title, and thought the case was governed by Helm v. Logan's Heirs. He considered the decisions in all the deed cases sound, but claimed that they rested on "different principles." There is nothing in this difference between a mortgage and a deed to lead to different decisions in such cases. But he was on the right track in putting the question:

"Is this statute requiring mortgages to be recorded before they shall affect creditors to have any effect?"

And in expressing himself thus:

"The execution creditor by his fi. fa. and levy, before the recording of the mortgage, gets a prior lien which the law secures to him, and, of course, must give him the means to effectuate and make it available, else it still amounts to nothing, but becomes a 'mere thing of delusion.' How is his lien to be effectuated but by carrying out the mandates of the execution by sale? If the creditor has the right to sell, some one must have the right to purchase, for there is no such anomaly and absurdity in the law as giving the right of sale to the creditor and at the same time prohibiting the world from purchasing. The right of sale to the execution creditor carries to the world the right of purchasing. If the conscience of the execution creditor remains untainted by the subsequent recording of the mortgage and he still has the right of sale, the purchaser under his execution remains untouched and has the right to purchase, else, as said in 4 Bibb, there would be the absurdity of sale in the execution creditor, but the right of purchase in no one, not even himself; for the world would not purchase, and, if he did, he loses his right as a prior lien execution creditor and becomes a purchaser with notice. His execution is satisfied and he gets nothing."

After this case all attempt to reason the matter out and determine where the truth lay ceased. In the remaining two cases of Low v. Blincoe and Baldwin v. Crow the sole effort was to extract from the earlier cases what should be accepted as presenting the then law on the subject. The controversy in Low v. Blincoe was between an execution purchaser and the holder of a deed unrecorded at the time of the levy of the execution, but recorded at the time of the sale. The execution purchaser had actual notice of the deed at the time of the sale, and was the creditor in the execution. It does not appear whether he was an antecedent or subsequent creditor, but it is not likely that he was the former. It was held that the holder of the deed had the better right. Judge Lindsay said:

"The question thus raised has frequently been before this court for consideration, and the decisions thereon are singularly inconsistent with each other."

He referred to Helm v. Logan's Heirs and Graham v. Samuel as "the earlier cases," and stated that they had held "that a deed not

lodged for record within the prescribed time was absolutely void as to any creditor." "In Morton v. Robards," he said, "this construction of the statute was repudiated, the court holding that the Legislature intended only to regulate legal conveyances and to leave untouched the equities of the parties, and that while the legal title of a party not lodging his deed for record * * * was not good, yet his equity was unimpeachable, and that a title acquired under an execution sale with notice of such equity would be made to yield to it in a court of chancery." He then said that "the correctness of the doctrine in Morton v. Robards was doubted in Halley v. Oldham," and that in the latter case it was "conceded that, if the execution creditor was himself the purchaser, then notice of the existence of the unrecorded deed would deprive him of its fruits, and that a court of equity might compel him to relinquish any legal advantage he might have acquired under it." His statement that the decisions were "singularly inconsistent with each other," if true, left no room for reconciliation. The situation presented a case for determining where the truth lay, yet he made an effort at reconciliation. He said:

"Reconciling as far as practicable the various reported cases, we deduce from them the following views:

"(1) A purchaser at an execution sale who has no notice of a title bond or deed that has not been recorded within the prescribed time will be protected in his title even in a court of equity.

"(2) A purchaser with notice will also be protected in case the execution creditor acts in good faith and without notice. Under such circumstances, the creditor has the right to sell, and the purchaser necessarily takes all the title that the creditor can require the sheriff to sell.

"(3) That notice to the purchaser after his purchase does not affect him. He is by his purchase invested with the inchoate legal title which he has the absolute legal right to perfect by procuring a conveyance from the sheriff, and this right does not depend upon his being a stranger to the execution. In such cases the execution creditor is as much entitled to protection as a stranger.

"(4) That notice to the creditor at any time before he may purchase affects his conscience and he may be compelled in obedience to the equity evidenced by the bond or unrecorded deed to transfer the legal title to the party against whom he ought not in good conscience to hold it"

—citing in support of the last proposition Halley v. Oldham and Righter v. Forrester.

As to these views I would say the law as thus presented is purely artificial. Four distinct rules are presented with no principle at the back of them necessitating their existence. Title bonds and deeds are classed together when the principles applicable to them are distinct. Title bonds are not included in the statute, and hence are not affected by it. The law as to them, therefore, is determined by general principles applicable to such cases. Deeds are included in it. Hence the law as to them is to be found in the true meaning of the statute. Then, on principle, there is no room for any difference between the case where the execution creditor is the purchaser and the one where a stranger or third party is.

In Baldwin v. Crow the controversy was between the execution creditor and the holder of an unrecorded mortgage. The sheriff in whose hands the execution had been placed had levied on the mortgaged

piano and the mortgagee had sued him for it. The execution creditor defended the suit. The case, therefore, was like Graham v. Samuel, in that the controversy was directly between the creditor and the holder of the instrument of writing not lodged for record. It was held that the mortgagee had the better right. The decision might have been based on the ground that the creditor was an antecedent creditor, which was the case, and therefore not included by the statute, but it was not. Judge Lewis said:

"If the inquiry whether, by that section, creditors generally were intended to be affected by notice of such conveyances and transfers of property to debtors in the same way and to the same extent as purchasers was an original one, there would, looking alone to the language used, be some difficulty in reaching a satisfactory conclusion. But there is no reason whatever that a creditor whose debt has been created prior to the conveyance, as was that of appellee, Crow, and who has not been defrauded or injured, should occupy a better attitude than a purchaser with notice."

But he did not rest his decision on that ground. He surveyed the earlier decision, and then said:

"The radical and irreconcilable difference between the two cases of Helm v. Logan's Heirs and Morton v. Robards is that in the former it was decided that the unrecorded conveyance was as to a creditor of the grantor or mortgagor to be held fraudulent and void, whereas in the latter the principle was announced that, though such an instrument did not operate to pass the legal title, it was evidence of an equity paramount to that acquired by a levy or sale with notice to the creditor and purchaser. In every case decided by this court since the opinion was rendered in Morton v. Robards where the question arose * * * the distinction taken in that case between the legal character and effect of an unrecorded conveyance and the equity of the holder thereof has been recognized and applied."

As to the statute itself he thus expressed himself:

"The clear and necessary implication from the language * * * is that deeds of trust and mortgages of real and personal estate, though unrecorded, are not void, but valid against purchasers at sale under execution as well as private sale when notice has been given. And, that being the case, it would seem to be the intention that creditors should be likewise though indirectly affected by notice; for their attempt to collect debt by execution would be generally abortive, if notice to those about to purchase could prevent a sale: But, be that as it may, by the uniform ruling of this court for many years, creditors and purchasers have in that respect been placed on the same footing."

So it was and in the way that I have indicated that the Court of Appeals practically eliminated the words "or against creditors" from the statute. The elimination began with the dictum of Campbell v. Moseby, and was established by the four cases of Morton v. Robards, Righter v. Forrester, Low v. Blincoe, and Baldwin v. Crow. The conflict which resulted in this elimination was between these cases and that dictum on the one hand and the earlier cases of Helm v. Logan's Heirs and Graham v. Samuel on the other. In it there was no question as to whether the statute included all creditors—i. e., antecedent and subsequent creditors with notice—as well as subsequent creditors without notice or was limited to the latter. The sole question was whether it included all creditors or none. Helm v. Logan's Heirs and Graham v. Samuel presupposed that it included all. The dictum in

Campbell v. Moseby and the other four cases in effect held that it included none. There was a hint in Graham v. Samuel that the statute might be limited to subsequent creditors without notice, and in Baldwin v. Crow that it did not include antecedent creditors. But the one was never taken, and the latter not until Wicks Bros. v. McConnell.

Such then was the situation when the case of Wicks Bros. v. McConnell arose. It cannot be said that there was then any confusion as to what the law on the subject was or any basis therefor. The court had simply been diverted from the path of truth, and seemingly was not conscious of the fact that it was not in that path. And it is clear that under the law as then declared it would have to be held that the mortgage in question herein would not have been invalid as against the attachments of the creditors on whose behalf the ground of attack now under consideration is urged. The confusion that now exists to which reference has been made has grown out of the decisions since Wicks Bros. v. McConnell. In that case the controversy related to certain machinery. It was between a creditor who had brought suit and obtained an attachment and the holder of an unrecorded mortgage in existence at the time of the creation of the debt in suit and the issuance and levy of the attachment. The creditor, therefore, was a subsequent creditor. He became so without notice. And he had through his attachment a hold or lien on the machinery. The holder of the mortgage brought suit to enforce his mortgage, and the two suits were consolidated and disposed of together. It was held that the attaching creditor had the better right. This decision was in direct conflict with the cases of Morton v. Robards, Righter v. Forrester, Low v. Blincoe, and Baldwin v. Crow; for, according to them, had no controversy arisen between the attaching creditor and the holder of the unrecorded mortgage, and the property been adjudged sold in furtherance of the attachment, the purchaser at the sale, at least if he were the creditor, would have acquired no title as against the mortgage if he purchased with notice of its existence. This could have been the case only on the ground that by the levy of the attachment the creditor acquired no absolute right as against the holder of the mortgage. Judge Durelle, who delivered the opinion, recognized the conflict that existed between the previous decisions. He said that the statute had "been frequently construed by this court, and as said by Judge Lindsay in Low v. Blincoe, 10 Bush (Ky.) 334, the decisions therein are singularly inconsistent." He did not so express himself, but it is clear that he thought that Morton v. Robards, Righter v. Forrester, Low v. Blincoe, and Baldwin v. Crow were wrong, in so far as they subordinated a subsequent creditor without notice who had acquired a hold or lien on the property or a purchaser at a sale in furtherance of such hold or lien to the holder of an instrument in writing of the kind covered by the statute not lodged for record in any contingency. It would seem that he accounted for those decisions, at least for Baldwin v. Crow, by the fact that the creditors therein were antecedent creditors. He said:

"Without reviewing those cases, which has been done in the case last referred to (i. e., Low v. Blincoe) and in Baldwin v. Crow, 86 Ky. 680 [7 S. W.

146], it may be said that in the case last named, which is the latest authoritative utterance of this court upon the subject, a distinction was clearly recognized between the position of an execution or attachment creditor without notice of an unrecorded mortgage lien whose debt was created antecedent to the creation of the lien and the position of one whose debt was created subsequently."

And again:

"It may be said that in that opinion is to be found the first intimation of such a distinction; but, on the other hand, the distinction is there clearly indicated, and is in our judgment right and equitable. The holder of an antecedent debt is in no wise defrauded by not being permitted to subject to the payment of his debt property subsequently acquired by his debtor which is subject to a lien."

It is not true that the first intimation of the distinction to which reference is made is to be found in Baldwin v. Crow. The first hint of it is to be found in Graham v. Samuel. It is found there in that Judge Nicholas noted the fact that the creditor there was a subsequent creditor without notice; the intimation in Baldwin v. Crow arising from Judge Lewis noting the fact that the creditor there was an antecedent one. But in neither case was the fact noted made the basis of the decision. In the one case the reference was made in answer to the argument from analogy and in the other as a portion of a reason why the creditor in that case should not be favored. As to the other decisions he said:

"Moreover, in none of the cases to which we have been referred in which the holder of a pocket lien has been held to have a claim superior to an execution or attachment creditor does it appear that the latter's debt was created subsequent to the creation of the lien."

That is true. But there is no reason to believe that, had it appeared, the fact would have made any difference in the result. The doctrine of specific equity which was at the bottom of those cases would have subordinated the right of the subsequent creditor without notice to that of the holder of the pocket lien as much so as the right of an antecedent one.

None of the cases giving such holder superiority therefore were really distinguishable from the case in hand on the basis on which the attempt to distinguish them was made. The thing to do was not to distinguish them, but to overrule them as a departure from the path of truth. But it was not appreciated wherein the departure had been made, and hence the attempt to distinguish them.

The reasoning upon which the decision of the case was based was thus put:

"If this be not the construction, then the language of the statute 'or against creditors' is entirely nugatory. There must be some class of creditors to which this language applies. The law gives to the execution or attachment creditor a lien. The law also provides that a mortgage shall not affect him, except from its recording, and equity and good conscience do not require the court to disregard the will of the Legislature, and inflict upon creditors whose equity is superior to that of the mortgagee the evils which the statute was designed to restrain."

The true doctrine in such cases he then set forth in these words:·

"On the one hand, the unrecorded lien is upheld as against creditors who cannot be presumed to have given credit upon the faith of the property held in lien. On the other hand, creditors who may be presumed on such faith to have given credit are protected as·against the secret lien in the rights which they secure by their diligence in the levy of their execution or attachment."

It was in this case, then, that it was clearly and definitely laid down for the first time that the creditors had in view by the statute were subsequent creditors without notice. In no. prior case had this been done. It so happened in this case that the creditor was not merely a subsequent creditor without notice, but one who had secured a hold or lien by his own activity by the issuance and levy of an attachment. Possibly in view of this it cannot be said that the case is an authority against the proposition that such a creditor who has not thus or in some way by his own activity acquired a hold or lien is not had in view by the statute, or, putting it affirmatively, in support of the proposition that the only creditor which the statute has in view is such a creditor who has by his own activity acquired a hold or lien. But the court thought of no other creditor than such creditor as being included by the statute. In stating the doctrine of such cases, it limited the protection of the statute to such creditors as have secured rights "by their diligence in the levy of their execution or attachment." Of course, creditors who had secured rights by their diligence in bringing suit in equity on a return of nulla bona to subject the property to their debts would also be included. And such should be accepted as the position of the court until held otherwise in a case involving the question. In each of the cases thus far considered, where the creditor's right has been upheld, to wit, Helm v. Logan's Heirs, Graham v. Samuel, and Wicks Bros. v. McConnell, he had by his own activity acquired a hold or lien—in Helm v. Logan's Heirs by the issuance and levy of an execution; in Graham v. Samuel by a suit in equity on a return of nulla bona; and in Wicks Bros. v. McConnell by issuance and levy of an attachment. In each of the cases where the creditor's right has been denied, it was denied notwithstanding he had by his own activity acquired a hold or lien by the issuance and levy of an attachment or execution. It would be going to an extreme, with this history behind it, for the court now to hold that the creditor's right should be upheld, though he has obtained no hold or lien in any of these three ways. And the statute itself is not without an indication that such is its true construction. It includes two classes of persons —purchasers for a valuable consideration without notice and creditors. Though it is not so expressed, the purchasers included are subsequent purchasers. It is expressly required that they be without notice. A purchaser has a hold on the property purchased, and he has acquired it by his own activity. In connection with this class of persons then we find the four qualifications, subsequent, without notice, having a hold on the property, and that acquired by their own activity. Placed in .the same category with them is another class of persons, to wit, creditors. Applying the maxim, "Noscitur a sociis," is it not to be

taken that the creditors called for are not the creditors generally, but subsequent, without notice, and who have acquired a hold on the property by their own activity? The trustee suggests that the purchaser does not acquire the better right until he has paid the purchase money without notice, the mere fact of purchase not being sufficient, and argues therefrom that the creditor from the mere payment without notice becomes like the purchaser, and entitled to the better right. But the purchaser has a hold on the property, and such creditor has not. It is not until he acquires a hold that he becomes in all respects like a purchaser. The underlying thought, then, of the statute is that, when a person subsequent to the execution of an unrecorded instrument of writing of the character called for acquires a hold on the property covered thereby, either as purchaser or creditor, and parts with his money without notice thereof, he shall have the better right.

The confusion that exists as to just what is to be taken as the position of the Court of Appeals on the question under consideration heretofore referred to has arisen since the case of Wicks Bros. v. McConnell, and that mainly from a dictum of that court in the last case that has been before it involving the statute, to wit, the case of Swafford v. Asher (Ky.) 105 S. W. 164. Before dealing with it, reference should be made to certain cases intervening between it and Wicks Bros. v. McConnell, to wit: Clift v. Williams, 105 Ky. 559, 49 S. W. 328, 51 S. W. 821; Cin. Leaf Tob. Wh. Co. v. Combs, 109 Ky. 21, 58 S. W. 420; Bowles v. Jones, 123 Ky. 395, 96 S. W. 1121. In Clift v. Williams the creditors had not acquired a hold or lien on the property by their own activity, and it was held that their rights were subordinate to the rights of the holder of the instrument of writing, not lodged for record. But the basis of the decision was not that such hold had not been acquired. It was that the creditors were antecedent creditors. But no inference can be drawn therefrom that, had the creditors been subsequent creditors without notice, the decision would have been otherwise. The debtor had died, and in a suit to settle his estate the general creditors relied on the statute to defeat an unrecorded lien asserted by the holder thereof as against a portion of the property left by the decedent. In the decision the doctrine as laid down by Judge Durelle in Wicks Bros. v. McConnell was quoted with approval. In Cincinnati Leaf Tobacco Warehouse Co. v. Combs the debtor had made an assignment for the benefit of creditors, and the controversy was between the holder of an unrecorded mortgage and the assignee. It did not appear whether the creditors or any of them were antecedent or subsequent creditors. It was held that the holder of the mortgage took the prior right. The basis of the decision was that, as the mortgage was enforceable against the assignor, it was enforceable against the assignee. Judge Hobson said:

"Under the rule laid down in these cases any equity which may be enforced against the assignor is equally available against the assignee."

And again:

"Appellant, therefore, stands on the plane of a mortgagee holding an unrecorded mortgage, and as against the assignee for the benefit of creditors its older equity must prevail."

In answer to the suggestion that section 496 applied and invalidated the mortgage he said:

"But as the assignee for the benefit of the creditors, being neither a purchaser for a valuable consideration, nor a creditor, is not protected by the statute."

According to these expressions, therefore, an assignee for the benefit of creditors takes subject to an unrecorded instrument of writing of the character called for by the statute, and cannot in any case claim that it is invalid, because he is neither a purchaser for value nor a creditor, and hence is not included by the statute. He cannot do so, even though certain of the general creditors may be subsequent creditors without notice and on their behalf. It cannot be that it was thought that in such a case such creditors on their own behalf could claim the benefit of the statute. If so, they could only do so by repudiating any benefit under the assignment which places them on an equality with the other creditors. There is not the slightest hint that they had any such right. It does not appear that there were any such creditors in the case. It is likely that they were all antecedent creditors. I gather this from this statement immediately following that last quoted:

"Even as to creditors, the rule is well settled in this state that the oldest equity prevails, and that an unrecorded mortgage will have preference over an attachment or an execution lien of at least antecedent creditors if notice is given before a sale of the property."

In support thereof he cited the cases of Baldwin v. Crow, Wicks Bros. v. McConnell, and Clift v. Williams. From the reference to antecedent creditors therein it is likely that the creditors were antecedent. The leaning, however, of the case is against the position that a subsequent creditor without notice who has acquired no hold or lien by his own activity has the better right as against an unrecorded instrument of writing. In Bowles v. Jones the controversy related to a crop of tobacco, and was between subsequent creditors without notice who had sued and obtained attachments which had been levied on the tobacco and the holder of an unrecorded mortgage. It was held that the creditors had the better right. This makes the fourth and last case where the creditor has been given the better right; the other three being Helm v. Logan's Heirs, Graham v. Samuel, and Wicks Bros. v. McConnell. In each one of the four the creditor had acquired by his own activity a hold or lien, and in all but Helm v. Logan's Heirs he was certainly a subsequent creditor without notice. And in no case has it ever been held that a subsequent creditor without notice who had not by his own activity acquired a hold or lien had the better right. But in the dictum in Swafford v. Asher, heretofore referred to, there is an intimation, at least, that such a creditor who had not by his own activity acquired a hold or lien might have a better right. The controversy related to certain teams, and was between the personal representative of the debtor and the holder of an unrecorded mortgage. It was like Clift v. Williams, in that with one exception the creditors of the decedent were antecedent creditors, and he, though a subsequent creditor, was such with notice, but differed therefrom,

in that there the controversy arose in a suit to settle the estate of the decedent, and was between the creditors directly and the holder of the unrecorded mortgage, whereas here it was between the latter and the personal representative in a suit between them. It was held that such holder had the better right. Judge Barker said:

"There is no doubt that, as between Swafford and Asher, the latter had a lien upon the teams for the advances made, and we perceive no reason why the creditors, none of whose debts are shown to have been subsequent to the mortgage, should stand in a better attitude than the principal, Swafford, would have done if he were alive."

He continued in these words:

"As the mortgage was not recorded, it would, of course, not be valid as to creditors whose debts were subsequently created; but as to those whose debts were created prior to the purchase of the teams and the mortgage upon them the lien is valid, although not recorded as required by section 496 of the Kentucky Statutes of 1903, and, as said before, there is nothing to show that any debt of the estate was created after the purchase of the teams, except that of appellant who had actual notice."

It is in the intimation that, if there had been any subsequent creditors of decedent without notice, they would have had the better right, that Judge Barker went beyond the requirements of the case, and pronounced a dictum, and, in view of the presentation I have made, I cannot accept that the Court of Appeals will ever hold in a case involving the question in accordance with this dictum.

The question here involved has frequently been before the appropriate federal courts. It first arose before me in the case of In re Sewell (D. C.) 111 Fed. 791. I there held that the holder of an unrecorded mortgage had the better right as against the trustee in bankruptcy because none of the creditors represented by him had by their own activity acquired a hold on the property covered by the mortgage. It then arose before Judge Evans in the case of In re Ducker (D. C.) 133 Fed. 771, and he took the opposite position. His judgment on appeal was affirmed, and it was held that I was wrong. In re Ducker, 134 Fed. 43, 67 C. C. A. 117. Subsequently a case came before the appellate court from Ohio whose statute is substantially similar to the Kentucky statute. That court adhered to its opinion in the Ducker Case. Dolle v. Cassell, 135 Fed. 52, 67 C. C. A. 526. This case was carried to the Supreme Court, and that court reversed the appellate court. York v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782. Subsequently another case arose before Judge Evans. The York v. Cassell Case was urged upon him as overthrowing the Ducker Case. He did not think so, on the ground that the Ohio statute differed from the Kentucky statute. In re Doran (D. C.) 148 Fed. 327. The appellate court on appeal reversed his judgment. In re Doran, 154 Fed. 467, 83 C. C. A. 265. Yet another case arose before Judge Evans, and he adhered to his position in the Doran Case. The judgment in this case was reversed by the appellate court. Crucible Steel Co. v. Holt, 174 Fed. 127, 98 C. C. A. 101. The judgment of the appellate court was carried to the Supreme Court, and affirmed by it. Holt v. Crucible Steel Co., 224 U. S. 262, 32 Sup. Ct. 414, 56 L. Ed. 756. In this case that of Swafford v. Asher and an earlier case, not heretofore referred to and not of

sufficient consequence to call for comment, were cited and relied on,
and the claim was made according to Judge Severens "that the Court
of Appeals has finally settled the law to be that the general creditors
who have become such while the mortgage remained unfiled are to be
protected." He seems to have thought that there was a possible justi-
fication for the claim, as he said:

"The court below seems to have so held, and some of the language of the
judges who delivered opinions in those cases seem to favor that construction."

And he stated the position of the court thus:

"We think we ought not to overrule our decision without a more positive
demonstration that the law of Kentucky is to the contrary of what we there-
(i. e., in the Doran Case) held."

In the Supreme Court Judge Van Deventer said:

"What was said in Wicks Bros. v. McConnell should be accepted as reflect-
ing the true construction of section 496, in the absence of some more positive
and direct ruling upon the subject by the Court of Appeals of the state. Such
was the view of the Circuit Court of Appeals, and we are at least unable to
say that it was wrong."

It is largely because of this uncertainty on the part of these two
courts as to just what the law of this state in this particular is that
I have devoted so much time and space to the matter. The result is
that I feel driven to the conclusion that the only creditors in-
cluded by the statute are such subsequent creditors without notice
as have acquired by their own activity a hold or lien on the property.
The decisions of the appellate court for this circuit and the Supreme
Court are sufficient in themselves to require me to so decide. But I
would so decide if these decisions were out of the way. I cannot con-
ceive that it is possible that the Court of Appeals of Kentucky in view
of its previous decisions under the statute, an account of which has
been fully set forth herein, will ever hold otherwise.

This brings me to the other question, whether the creditors included
by the statute as already determined must acquire a hold or lien before
the instrument of writing involved is recorded. Is it sufficient that
they acquire such hold or lien after it is recorded? I think that it
follows from the fact that they must acquire such hold or lien that
they must acquire it before the instrument of writing is recorded. The
statute provides that the instrument of writing shall be "invalid" un-
til it is recorded; i. e., up to its being recorded, or as late as it is re-
corded. This implies that, as soon as it is recorded, it is valid. It is
invalid, therefore, only against those who become such creditors as
the statute calls for before the instrument is recorded. As to those
who so become after it is recorded it is valid. In this an additional
reason is to be found for the position that the statute includes only
such subsequent creditors without notice as have acquired a hold or
lien. The statute seems to contemplate that the creditors must be in
a position to question the validity of the writing before it is recorded,
and that they cannot do so unless they have acquired a hold or lien.
It is contended by the trustee that the decision in Graham v. Samuel
is an authority against this. In giving the facts of that case I noted

that the mortgage, an absolute deed on its face, involved in that case, had been recorded long before the creditor brought his suit in equity on a return of nulla bona attacking it and seeking to subject the property to his debt; and in considering the case I ignored this circumstance for the time being. Its significance must now be dealt with, for it was held therein, as we have already found, that, notwithstanding it, the creditor had the better right. This decision is not an authority against the position here taken. I have heretofore stated that the statute, substantially as it is now, has been in existence from an early period in the history of the state. This statement needs to be qualified. At the time of the decision in Graham v. Samuel the statute differed in an important particular from what it is now. In those days it prescribed that the instrument should be recorded in a definite time, and that it would not be valid unless recorded within that time. As to deeds the provision was that they should not be good against a purchaser for a valuable consideration not having notice thereof, or any creditor, "unless" acknowledged within eight months and lodged for record, and, as to deeds of mortgage or deeds of trust, that they should not be good or valid against any creditor or a purchaser for valuable consideration without notice thereof "unless such deed shall within sixty days after its execution" be acknowledged and lodged for record. In Graham v. Samuel the deed had been executed in August, 1819, and recorded in July, 1820. Not having been recorded within the required time, it was as if it had never been recorded at all. When executed, it was intended as a deed, and was so held until the time when recorded. At that time the contract of purchase under which it had been delivered or held was canceled, and it was thereafter held as a mortgage to secure a certain indebtedness. As a mortgage it was not withheld from record for any length of time, but was at once recorded. In view of this circumstance possibly there was room to hold that it was recorded in time, and hence that it was valid. But no notice was taken of this, and it was assumed that it had not been recorded within the required time. The statute, as it was when the mortgage in question herein was executed, prescribed no time within which it should be recorded. It provided merely that until recorded it should not be valid, implying that as soon as recorded it should be. In view of this difference in the statutes, the decision in Graham v. Samuel is not an authority against the position here taken. On the other hand, the decisions of the Supreme Court of Ohio under its statute and that of the appellate court for this circuit, following those decisions in the case of In re Shirley, 112 Fed. 301, 50 C. C. A. 252, are persuasive of the soundness of that position. The Ohio statute provides that a mortgage "shall be absolutely void as against the creditors of the mortgagor, subsequent purchasers and mortgagees in good faith, unless the mortgage or true copy thereof be forthwith deposited for record." The construction so placed on the statute is that, although it says that the mortgage shall be absolutely void unless it be forthwith deposited for record, the mortgage is good even as against subsequent creditors without notice, unless the creditors acquire or hold on the property before it is deposited for record. Judge Day in the Shirley Case set forth the

decision of the Supreme Court of Ohio in the case of Wilson v. Leslie, 20 Ohio, 161, in these words:

"In that case it was held that the statute declaring the mortgage absolutely void as against the creditors of the mortgagee and as against subsequent purchasers of the mortgagee in good faith, unless the mortgage or a true copy thereof shall be deposited forthwith as directed in the act, did not make the mortgage void as between the parties thereto, but only avoided the instrument as to those creditors who, between the time of the execution of the mortgage and the filing thereof, had taken steps to fasten upon the property for the payment of their debts. As against such as had in the interim secured liens by attachment, execution or otherwise, the mortgage would be void. When filed with the recorder, the instrument became valid as against all persons except those whose rights have attached upon the property before the recording of the instrument. Judge Spalding, delivering the opinion, gives weight to mere delay in the filing of the mortgage only as important in determining the rights of the parties where it has been so great as to taint the transaction with fraud."

He said further:

"Applying the law thus settled to the finding of facts in the present case, we find a mortgage which as against the contesting creditors had no force and effect until filed with the proper officer. It was as ineffectual to create a lien as against them as a mere agreement for a mortgage would have been, but, where properly executed and duly filed, it became operative as against creditors who had not, before its filing, fastened some valid lien or right upon the property. It could only be avoided after such filing by proof of fraud in the making or withholding it from record."

The fact that by the construction placed by the Ohio Supreme Court on its statute its benefits are not limited to subsequent creditors without notice, but belong to creditors generally, in this particular, therefore, differing from the Kentucky statute, does not differentiate the Shirley Case and those which it follows from this case as to the matter now in hand. Both statutes as construed are limited to creditors—in the one case generally and in the other subsequent without notice—who have acquired a hold or lien; i. e. fastened on the property. These cases arising under the Ohio statute decide that this fastening must take place before the instrument is recorded. This is persuasive that it must so take place under the Kentucky statute. I think, then, that the position of the Court of Appeals of Kentucky as to the meaning of this portion of the statute must now be taken to be that it applies only to subsequent creditors without notice who by their own activity have acquired a hold or lien on the property covered by the instrument of writing before it is lodged for record, and that, where such a creditor has acquired such a hold or lien, notice to the purchaser at a sale in furtherance thereof, whoever he may be, of the existence of the writing before his purchase, will not affect his right thereby acquired. This ground of attack on the mortgage, therefore, is not well taken.

[4] This brings us to the matter of the meritoriousness of the debt and mortgage. It is at least doubted whether the debt is as large as claimed, and whether the mortgage was executed simultaneously with the debt, and claimed that it was fraudulently withheld from record until the bankrupt's failure. The facts, more in detail than heretofore stated, as to the execution of the notes and mortgage, as claimed

by the mortgagee, should now be set forth. Before the purchase of the property, the bankrupt was occupying this saloon as her tenant. He was a customer of the Christian Moerlein Brewing Company in the purchase of his beer. When he bargained for the property, that company had agreed to furnish him $4,500 upon a first mortgage of the property, out of which he could pay her the cash payment of $4,000, she to take the second mortgage for the balance, to wit, $6,800. Accordingly, on January 20, 1909, a reputable lawyer and notary public named Glenn prepared the deed to be executed by her to the bankrupt and the mortgage to be executed by him and his wife to her to secure the $6,800. In the latter it was recited that it was "subject to a payment of the mortgage of the grantors to the Christian Moerlein Brewing Company upon the above described property of date ———— day of January, 1909, and of record in Mortgage Book ————, page ————, of said records with the understanding that if any payment herein provided for or in said Moerlein Brewing Company's mortgage remains unpaid for sixty days after the same becomes due and payable, as provided, then and in that event, grantee may elect to have all said payments become due and payable as though by lapse of time."

The deed was that day signed by the claimant, and sent to Memphis for the signature of her husband, who signed and acknowledged it on January 22, 1909, and returned at once. Things were held thus in abeyance until shortly before February 16, 1909, because of the neglect of the Moerlein Brewing Company to comply with its agreement. Upon its still neglecting, if not actually refusing, to do so, the bankrupt applied to Wm. Reidlin, hereinbefore mentioned, president of the Bavarian Brewing Company, a rival concern, for a loan of the $4,500 on the same terms, the bankrupt thereafter to become its customer and drop the Moerlein Brewing Company. He agreed to make the loan. Thereupon on February 15, 1909, the claimant acknowledged the deed to the bankrupt before Glenn, and that day or the next morning delivered it to him. It was lodged for record on the morning of February 16, 1909, and at the same time the bankrupt and his wife executed the mortgage to Reidlin to indemnify him as surety of the bankrupt to the Farmers'. & Traders' National Bank on the loan of $4,500, out of which he paid the claimant the cash payment of $4,000, which mortgage was also lodged for record at that time. That same day in the afternoon the bankrupt executed his five notes to the claimant for $6,800, the balance of the purchase price, and he and his wife executed and acknowledged the mortgage to secure same which had been prepared on January 20, 1909, at the same time the deed from claimant to the bankrupt was prepared. The notes were prepared by, and the mortgage was acknowledged before, Glenn, who had prepared the deed and mortgage and taken the claimant's acknowledgment to the deed. Glenn had nothing to do with the preparation and acknowledgment of the Reidlin mortgage, and it is likely that he was not informed of the change from the Moerlein Brewing Company to the Bavarian Brewing Company. I infer this from the fact that the mortgage executed by the bankrupt and his wife to the claimant was, as it had been originally prepared, except that the date "———— January, 1909," was

changed by Glenn to the "16th day of February, 1909," no change being made in the reference to the Christian Moerlein Brewing Company. At the time this controversy arose Glenn had become mentally unbalanced, and he subsequently died so that no testimony could be obtained from him as to why no change was made in this reference. On the morning of the 16th—i. e., when the deed was lodged for record and the mortgage executed to Reidlin—the claimant had a talk with him over the telephone, in which she told him that she wanted a mortgage for the balance of the purchase money subject to his mortgage, and he advised her not to record it as she would have "to pay double taxation" if she did, and in the afternoon, when the mortgage was executed and acknowledged, she told Glenn of this advice, and he approved it. It was pursuant to this advice that she did not record the mortgage, but put it away with the notes in her trunk where it remained until after the bankrupt fled. This he did on Saturday August 13, 1910. She lodged the mortgage for record on Tuesday, August 16, 1910. The basis for the doubt as to whether the mortgage was executed on February 16, 1909, simultaneously with the delivery of the deed is two things:

One is that on August 13, 1910, the bankrupt caused to be prepared, executed, and acknowledged a mortgage from himself and wife to the claimant to secure the $6,800, and left it with his attorney to lodge for record after he was gone which he did on Monday, the 15th. He also left a letter for her in which he informed her what he had done, which she probably received and read before lodging the mortgage of date February 16, 1909, for record. She knew nothing of his contemplated flight, and had nothing to do with the preparation and lodging for record of the mortgage of August 13, 1910. It was entirely his own conception. She knew something was wrong on Sunday, the 14th, but did not ascertain that he had fled until Tuesday, the 16th, the day she lodged the mortgage of February 16, 1909, for record.

The other thing is testimony on the part of the bankrupt and of his wife that they had never executed any other mortgage to the claimant than that of August 13, 1910. On October 26, 1910, the claimant filed before the referee her claim consisting of her notes and the mortgage of February 16, 1909. This disclosed to the trustee that she was claiming under this mortgage, if he had not already ascertained its existence from the records, which was probably the case. Thereupon the trustee, because of the mortgage of August 13, 1910, conceived the idea that, if he could obtain the testimony of the bankrupt and his wife without his having any communication beforehand with the claimant, they might testify that they never executed the mortgage of February 16, 1909. They were then living in Detroit, Mich. Without notice to the claimant, the trustee appeared in Detroit on November 14, 1910, and obtained an order of reference from the United States District Court for that district to the referee in bankruptcy, which required the bankrupt and his wife to appear before him forthwith for examination. They were served that evening with subpœna to

appear the next morning, which they did, and they were then examined. The bankrupt and his wife on that occasion testified as above stated, though the wife was not as positive as the bankrupt. The fact of the execution of the mortgage of August 13, 1909, and this testimony on the part of the bankrupt and his wife, show, at least, that on both occasions they had forgotten about the execution of the mortgage, and perhaps it is difficult to account for their forgetting it if it had been executed as claimed. Possibly, so far as the bankrupt is concerned, it is due to the fact that he understood from the talk over the telephone between claimant and Mr. Reidlin on the morning of February 16th that the claimant was not to take any mortgage, not that he was not to have it recorded, and this made a deeper impression on him than the fact of the execution and acknowledgment of the mortgage. Mr. Reidlin's testimony is to the effect that he then understood that no mortgage was to be taken and that of the bankrupt at Detroit is to the same effect. But, however it is to be accounted for, I have not the slightest doubt that the mortgage was executed and acknowledged on February 16, 1909, as claimed, and that there is no want of genuineness in it. The bankrupt and his wife when they executed the mortgage of August 13, 1910, and when they testified in Detroit had forgotten about its execution, however their so forgetting is to be accounted for. The mortgage shows on its face that it was prepared at the same time that the deed from claimant to the bankrupt was prepared and by the same person. The typewriting therein is proven to have been done on Mr. Glenn's machine, and all the handwriting but the signatures is his. It is regularly certified by him, under seal, as having been executed and acknowledged on that date. And then the fact that no change was made in the reference to the Christian Moerlein Brewing Company is a clear indication of genuineness. A mortgage gotten up for the purposes of this case would not have contained this mistake. Besides, the bankrupt's wife in her testimony at Detroit made statements that cannot be accounted for except on the basis that the mortgage of February 16, 1909, is genuine. She stated that at the time of the purchase of the property she did nothing whatever only to sign the papers—a paper that she supposed the wife had to sign, but which she did not just know what it was. This might have referred to the Reidlin mortgage, but she did not stop here. She stated, further, that the paper was signed when Lawyer Glenn was up at claimant's and when no one was present except her husband, the claimant, lawyer Glenn and herself. This could not have had reference to the Reidlin mortgage. It could only have referred to claimant's mortgage of February 16, 1909. It would have been fair to have submitted that mortgage to the bankrupt and his wife, and to have asked them directly about it, but this course was not pursued. Besides these facts and circumstances, the execution of the mortgage is proven by the testimony of the claimant and that of the bankrupt and his wife taken on their behalf after the Detroit examination. Possibly the testimony of the bankrupt on this occasion shows a better recollection than one would expect after the Detroit testimony.

The basis of the doubt as to whether the debt is as large as claimed is the testimony of certain real estate men that the property was not worth more than $7,000 or $8,000 at the time the bankrupt bought it and the testimony of a number of reputable witnesses that the bankrupt had said to them after his purchase and before he fled that he had purchased the property for $8,000. The latter testimony is denied by the bankrupt, but the weight of the testimony is against him, and the evidence gives no indication as to why he should make such statements if not true. But it is inadmissible as against claimant. The former testimony is of but little value. I am clear, however, that the debt as well as the mortgage is genuine. It is proven by the testimony of the claimant and that of the bankrupt and his wife. The testimony of the bankrupt and his wife to this effect is not only that given by them in their depositions on behalf of claimant, but that given at Detroit. The circumstances under which that testimony was taken gives distinct value to it. There was no opportunity given to the bankrupt or his wife to make up a false story. What they testified to was their then recollection. Besides, the matter is put beyond question by a circumstance. That circumstance is that the mortgage when first prepared specified the notes to be secured by it, and they amounted to $6,800. This represented the balance to be due the claimant after she received $4,000 from the cash to be loaned the bankrupt by the Christian Moerlein Brewing Company and subsequently loaned by the bank with Reidlin as surety on a first mortgage on the property. Clearly the $4,000 was not a payment on the $6,800 as has been intimated by the trustee. It was in addition thereto, and the whole purchase price must have been $10,800 as claimed.

[5] This brings me to the contention that the mortgage was fraudulently withheld from record, and is therefore void. What are the facts in regard to this matter? It is certain that it was not through neglect that the mortgage was not lodged for record. It was purposely not so lodged sooner than it was; i. e., it was withheld from record until then. It is just as certain that its being withheld is directly chargeable to Mr. Reidlin, who and his company hold more than two-thirds of the indebtedness incurred subsequent to the execution of the mortgage. If it had not been for his advice, the mortgage would have been lodged for record as soon as it was executed. I make this out from his testimony. There is some contrariety in the testimony as to the talk over the telephone between him and the claimant on the morning of February 16, 1909, to which reference has heretofore been made. But such differences as exist are readily reconcilable. There is a difference for instance as to how the talk came about. The claimant testified that on the morning of the 16th she learned that the bankrupt and his wife had gone to Covington, the county seat, to lodge the deed for record, and to execute and lodge for record the Reidlin mortgage; that she thought she should have been advised that they were going, so that she could have gone with them, and had her mortgage fixed up at the same time; and that thereupon she called up the bankrupt over the telephone, and, after complaining of his action, at her request he called up Mr. Reidlin to the telephone, so that she might talk

with him. He testified that the talk was at his instance. The deed expressed the consideration to be "$1.00 and other consideration paid and to be paid," and under advice he had the bankrupt call her up in order that he might understand as to the consideration to be paid. There is a difference, also, as to where Mr. Reidlin and the bankrupt were stationed at the time of the talk. The claimant has it that they were at the county clerk's office, and he that they were at the German National Bank, to which place they went from the county clerk's office. And there is a difference in a substantial degree as to the substance of the talk. They agree that she told him that she wanted a mortgage, but was willing that he have the first mortgage, she to take the second. They agree that he thereupon gave her advice as to her mortgage, and as to the reason he gave for the advice. She has it that he advised her not to record her mortgage, and she told him she would not do this, and he that he advised her not to take a mortgage, and she told him that she would not do this. The reason given for the advice as to which they agree was that otherwise she would have to pay double taxation. But I think these several differences are easily reconcilable. The claimant called up the bankrupt at the county court's office after the party had left for the bank, and, upon being told where they had gone, she called him up at the bank. They were there when the talk took place. The bankrupt testified that it happened this way, and it had simply escaped claimant that she did not have the talk with Mr. Reidlin whilst he was at the county court's office, where she called up the bankrupt. Then as to the one at whose instance the talk was had, it may have been a coincidence that at the time claimant expressed a desire to talk to Mr. Reidlin he indicated a desire to talk to her. The fact perhaps that he knew she was talking to the bankrupt may have led him to want to talk to her about the unpaid consideration. Then as to the substance of the talk, it is likely that Mr. Reidlin understood from the claimant that she would not take a mortgage. This could have happened without her intending to be so understood. That he so understood is supported by the bankrupt's Detroit testimony. It is a possible view of the matter that she did in fact tell him that she would not take a mortgage and that Glenn caused her to change her mind by advising her to take it but to withhold it from record, upon being told by her what Mr. Reidlin had advised her, which would accomplish the same thing as not taking it. But I am strongly inclined to the view that the advice he gave her was not to record the mortgage, and that what she said was that she would not do so, though he may have understood her to say that she would not take a mortgage. He testified distinctly that she told him that she wanted a mortgage. The withholding it from record would accomplish as much in the way of saving taxes as not taking it. Not taking it would not save her from having to pay taxes on the debt if it became known to the assessing officer that she held it. If known, that was as much liable to taxation without a mortgage as with it. The only possible way to save taxes was to keep it from being known, and that would be accomplished by withholding it from record. The reason for the advice which he gave her, therefore, called for no more than

that the mortgage which she told him she wanted should be withheld from record. She testified that that was what he advised and what she said she would do. The bankrupt, in his testimony on her behalf, testified to the same effect, but in view of his Detroit testimony not much weight is to be attached thereto. Then, whilst he did testify that what he advised was not to take a mortgage and that she told him that she would not, this question was asked him on cross-examination:

"And didn't you say to her, in substance, if not in exact words, 'Mrs. Watson, if you have confidence in your boy, it is not necessary to have your mortgage recorded,' or 'it is not necessary for you to take a second mortgage'? Didn't you say that to her in substance, if not in those precise words?"

To this question he answered:

"That was about the substance of the conversation.'

Then, again, it is to be noted that Mr. Reidlin testified after the Detroit testimony of the bankrupt, when he and his wife had testified that no mortgage was given, and that what the claimant had said in the telephone talk was that she would not take a mortgage. This testimony may, to some extent at least, have affected his. But, however this may be, the testimony requires that I should hold that the sole reason why the mortgage was withheld from record was that the claimant might not have to "pay double taxation"; that this idea of saving taxes and withholding the mortgage from record to this end was put in her head, at least, by Glenn, if not Mr. Reidlin, backed up by Glenn; and that it would not have been withheld but would have been put to record as soon as executed and acknowledged if Mr. Reidlin after he had been told by her that she wanted a mortgage, had not undertaken to advise her in regard to the matter. It is to be noted further in this connection that the mortgage was so withheld from record, not because of any agreement with the bankrupt. He was not consulted about it. Nor was it withheld to give him credit. Its withholding was solely on her own account, and not to favor him. The testimony leaves no room for doubt as to this. The only moral obliquity of which she was guilty was in trying to evade the taxes due from her on account of the indebtedness. And this is somewhat lessened by the low moral tone that pervades the community in such matters, by the advice of a reputable business man and a reputable lawyer, and by the thought that, if she paid taxes on the unpaid purchase money and the bankrupt on the property, there would be a payment of double taxes.

[6] Did, then, the withholding of the mortgage from record under these circumstances and for this reason render it void? The answer to this question depends upon what is the essential thing to render the withholding of a mortgage or deed from record void. I do not understand it to be essential that the withholding be pursuant to an agreement with the mortgagor or grantor. A mortgage or deed that is withheld from record may be void though there may be no such agreement. Nor is it sufficient to render it such that others may have given credit to the mortgagor or grantor on the faith that the existence of

a mortgage or deed is not shown by the record. In 20 Cyc. p. 447, it is said:

"Where it is either found that all the acts of the parties were done honestly and in good faith, or it is not found that they were dishonest or fraudulent, a deed or mortgage cannot be adjudged fraudulent or void solely on the ground that it was not recorded, and that in ignorance of the existence of the instrument assailed credit was given to the grantor upon the faith of his supposed ownership of the property. Where the deed is withheld from record merely to gratify the feelings of a proud debtor, the omission is not a fraudulent act."

The essential thing as I understand it is that there should be fraud in the withholding. The withholding must have been fraudulent. It should have been withheld for the conscious purpose of giving the mortgagor or grantor credit, and thereby enabling him to deceive others. The matter was put succinctly by Mr. Justice Brown in the case of Davis v. Schwartz, 155 U. S. 631, 639, 15 Sup. Ct. 237, 39 L. Ed. 289, when he said that the mortgage should be "withheld from record in order to give the mortgagor a fictitious credit."

The statement heretofore given of the circumstances under which the mortgage here was withheld and of the reason for withholding it negatives the existence of any such fraudulent purpose on the part of the claimant. In her account of the talk with Reidlin over the telephone and of her subsequent talk with Glenn, she testified that Reidlin said to her that she need not put the mortgage to record as long as she had confidence in her son, and that Glenn, upon being told by her what Reidlin had said, confirmed it, and added: "But, if there should come a change, I should put my deed (mortgage) to record."

Point is made by the trustee of this advice of Glenn. It is taken to mean that, if a change should come in the financial condition of her son and he should become involved in debt, then she should put the mortgage to record. But it meant no more than that if a change should come in her confidence in her son, which she had expressed, then she should act. And, were its meaning as claimed, it did not follow that the withholding of the mortgage pursuant thereto was in order to give her son fictitious credit. So doing was entirely consistent with the purpose being solely to save double taxation. Undoubtedly the withholding might give him fictitious credit, and she must have known that it might do so. But such knowledge did not necessarily involve that the withholding was in order to that end. The statute, as we have construed it, contemplates that credit may be given to the maker of an unrecorded recordable instrument of writing on the faith that he is the owner of the property covered by it and that it is unincumbered, and yet, if the writing is recorded before the creditor acquired a hold or lien thereon, it will prevail over him. In view of this, it is difficult to see how an instrument of writing withheld, in presumed reliance on this right but with the risk involved, can be held fraudulent and void when it is withheld not in order to give fictitious credit to the maker thereof but solely in order to save double taxation, as it is termed.

The subsequent indebtedness incurred by the bankrupt was mainly for the purpose of making improvements on the property. The ne-

cessity for these arose from competition from a rival establishment near by backed by the Christian Moerlein Brewing Company, which was set up shortly after the bankrupt changed from it to the Bavarian Brewing Company, and no doubt to some extent at least because of the change. It was quite natural for the latter company and Mr. Reidlin, its president, to encourage such expenditures on the part of the bankrupt in order that he might successfully meet this competition, and it is reasonable to take it that they did so. It was the indebtedness so incurred, in connection possibly with some incurred in the conduct of the business, that finally caused the bankrupt's failure. The bulk of this indebtedness, more than two-thirds of it, as heretofore stated, arose from advances made by the Bavarian Brewing Company and Mr. Reidlin, its president. And they are behind the attack on the mortgage. It may be assumed, for the sake of the argument, that they made the advances upon the idea that the property had no other mortgage on it than the first one, but they knew the bankrupt was indebted to the claimant on account of the purchase price. Because of the bankrupt's representations they thought the amount of this indebtedness was less than it really was. But the claimant to no extent misled them in this. There is no reason to doubt that at the time they could have ascertained the true amount upon inquiry of her. There is no evidence that she knew that this subsequent indebtedness had been incurred except from her knowledge of the making of the improvements. If she so inferred, she most likely inferred, also, that the Bavarian Brewing Company and Mr. Reidlin, who were backing the bankrupt, had furnished the money to make them. And according to her understanding they knew that she had a mortgage on the property for a balance of purchase money. In no particular do I find evidence of any unfair conduct on her part towards the bankrupt's creditors. There is certainly none as to those behind the attack on her mortgage. And if it had not been for the advice, volunteered by Mr. Reidlin, according to his own evidence, her mortgage would have been put to record immediately upon its execution. Harsh criticism of her conduct and testimony has been indulged in, but I do not find any warrant therefor in the evidence.

An order will be entered overruling the motion to reconsider.